Opinion
CHIN, J.
Evidence at the guilt and penalty trials established that defendant is the “Trailside Killer” who terrorized Californians in 1980 and 1981. Over several months, he assaulted hikers on remote paths in Santa Cruz and Marin Counties, shooting to death seven at close range with a .38-caliber Rossi revolver and raping some of them. An eighth shooting victim survived to testify against him.
In the case we now review, tried in Los Angeles County following a change of venue, a jury found defendant guilty of these crimes in Santa Cruz County: the first degree murders of Ellen Marie Hansen and Heather Scaggs, the attempted murder of Steven Russell Haertle, the attempted rape of Hansen, and the rape of Scaggs. The jury found true special circumstance allegations of multiple murder, rape murder as to both murders, and lying in wait as to the Hansen murder. As to the attempted murder, it found that defendant personally used a firearm and inflicted great bodily injury.
Following the penalty phase, a different jury returned a verdict of death. The court denied defendant’s automatic motion to modify the verdict and sentenced him to death.[1] This appeal is automatic. We affirm.
*345 I. Facts
A. Guilt Phase
1. Prosecution Evidence
a. The Hansen/Haertle Crimes
In March 1981, Steven Haertle was a junior and Ellen Hansen a sophomore at the University of California, Davis. The last weekend of the month, they went camping at Henry Cowell Redwoods State Park in the Santa Cruz Mountains. They spent Saturday night in the park, then visited Monterey on Sunday, March 29. That afternoon, they returned to the park and, around 4:00, decided to go for a hike. The two walked to an observation deck, then along the Ridge Trail towards the Cathedral Redwoods. About a mile from the deck, they met a man the evidence showed to be defendant. Defendant was walking in the opposite direction, and they passed without speaking. Haertle and Hansen continued to the Cathedral Redwoods, where they sat for a few minutes enjoying the view. They decided to retrace their steps and return to their campsite. While hiking back along the Ridge Trail, they again encountered defendant.
Defendant said, “ ‘Oh, we’ve met again,’ ” and then pulled out a black revolver. He pointed the weapon at the students and ordered, “ ‘Do what I say.’ ” Haertle put his hands up until defendant told him to put them down. Defendant told the two, “‘Do what I say. You won’t get hurt.’” Haertle warned Hansen, “ ‘Be careful, Ell. He’s got a gun.’ ” Defendant gestured at Haertle and told him to go down the trail. Haertle stepped backwards, then heard Hansen say, “ ‘Don’t listen to him, Steve. Don’t listen [to] what he says.’ ” Haertle pleaded with defendant to let them go. Defendant told them, “‘Now, listen to me and do what I say.’” He approached the two and, looking at Hansen, said, “ T want to rape you.’ ”
Hansen responded, “ ‘No, I’m not going to let you.’ ” Haertle advised her, “ ‘Ellen, stay away from him, he has a gun.’ ” Defendant ordered them to “move towards the bushes off the side of the trail,” and gestured with his . gun. They “both stayed away from the gun. As the gun moved [them] over to the edge of the trail, [they] went towards the edge of the trail.” Haertle started to lose his footing, “and then shots went off.” Haertle “felt like somebody hit [his] neck with a sledge hammer.” He also felt something hit his right hand. The next thing Haertle remembered was “waking up lying on the ground.”
Haertle observed Hansen “lying face down on the ground and her head was in a pool of blood.” He “picked up Ellen’s head to see if she was alive. *346 She wasn’t.” He saw defendant “across the trail with his back” to him. Haertle got up and, bleeding from the neck, fled towards the observation deck “as fast as [he] could.”
Leland and Kenneth Fritz, father and son, were also in the park that afternoon. Around 5:00, they saw defendant on the observation deck and briefly conversed with him. Defendant occasionally peered towards the Ridge Trail with binoculars. Defendant then left, and walked to the Ridge Trail. Two other campers, Fred and Maureen Morse, saw defendant get a drink of water at a fountain near the deck. A few minutes later, the Fritzes and Morses heard gunshots from the direction of the Ridge Trail. The Fritzes began walking down the trail in the direction of the shots. They soon met the wounded Haertle fleeing towards them. He told them what had happened. The Fritzes assisted Haertle to the observation deck, left him with the Morses, and went to summon help. Maureen Morse, a nursing assistant, began applying first aid. Fred Morse went down the trail to seek Hansen. He met defendant on the way. Defendant told Fred that someone had been shot along the trail, then continued walking.
While Haertle was receiving assistance, he saw defendant walk up the trail. He stood, pointed at defendant, and yelled at Maureen, “ ‘Lady, that’s the man that shot me, get out of here.’ ” Defendant kept going. Maureen testified defendant “was walking through the clearing . . . like he didn’t see us or hear [Haertle] yelling.” As soon as defendant disappeared from view, Maureen walked down the path towards Fred. Haertle fled to the campground, from which he was eventually taken to a hospital. Law enforcement officers soon arrived, but were unable to apprehend the gunman. Leland Fritz and a young girl in the area saw defendant speed away in a red Fiat.
Haertle’s initial assessment that Hansen was dead proved correct. She died of two gunshot wounds to the head and one to the right shoulder fired from close range. Haertle had been shot in the back of the neck. That night he underwent surgery, and the bullet was removed from behind the sternum. It had hit an artery and missed the heart by about two inches. Without prompt attention, Haertle could have bled to death. He was in the hospital for eight days and, as of trial, still suffered lingering effects from his injuries.
b. The Heather Scaggs Crimes
Heather Scaggs and defendant were coworkers at a trade school in Hayward. Scaggs lived in San Jose with her boyfriend. On May 2, 1981, she arranged to drive to Santa Cruz with defendant, where she hoped to purchase a car from a friend of his. Her own car was inoperable. Scaggs left home that morning and did not return. No one saw her alive after that day.
*347 That night some of Scaggs’s friends spoke with defendant to try to find out what had happened to her. Defendant confirmed that Scaggs and he had planned to go to Santa Cruz together, but claimed he overslept, had car trouble, and never saw her. A few days later, on May 8, he told the police the same thing.
On May 24,1981, hikers found a nude, decomposed body in mountainous, wooded terrain 136 yards off the roadway in the Big Basin State Park in Santa Cruz County, about 12 to 15 miles from the Henry Cowell State Park. Dental records proved it was Scaggs. She had died of a single gunshot wound to the face from close range. The vaginal tract contained a high concentration of seminal fluid with a large number of sperm, some with intact tails indicating they had been placed in the vagina around the time of death. The pathologist who performed the autopsy believed that the sperm were placed in the vagina within an hour of the gunshot wound. The condition of the sperm and body was consistent with the body being shot from above while lying on the ground after intercourse. Forensic analysis of the semen was inconclusive.
c. Evidence of Defendant’s Guilt
Ballistics analysis established that a single gun, a .38-caliber Rossi revolver, was used to shoot Scaggs, Hansen, and Haertle. Documents and testimony established that Mollie Purnell, defendant’s friend, purchased the weapon in the fall of 1980. Purnell testified under a grant of immunity that she bought it at defendant’s request and gave it to him. He paid for it. When she was first questioned by law enforcement agents after defendant’s arrest, Purnell said the gun had been stolen. Defendant had told her to say that “if anything happened.” Two other witnesses testified that defendant showed them a similar-appearing weapon in late 1980 and early 1981. The police found the revolver buried under broken asphalt in a vacant lot in San Francisco. Shane Williams led them to it. Williams and his wife Karen, both bank robbers, testified that defendant gave them the gun on May 13, 1981, shortly before his arrest. Shane used the gun in a bank robbery, then hid it in the vacant lot after defendant was arrested.
The gunman who assaulted Haertle and Hansen was clean shaven. When arrested, defendant wore a beard, which he had started to grow after that assault. Witnesses viewed him in a physical lineup in which all the participants were bearded. Pursuant to a court order, defendant appeared clean shaven at trial. Haertle positively identified defendant as his assailant at the lineup and in court. Leland Fritz also identified defendant both at the lineup and in court. The girl who saw the red Fiat speed away from the crime scene *348 identified a different person at the lineup, but defendant in court. Kenneth Fritz and the Morses could identify no one at the lineup, but identified defendant in court.
Haertle, the Morses, and the Fritzes generally described the gunman as wearing a distinctive gold jacket and a blue or green baseball cap. Candy Townsend lived with defendant in early 1981. She testified defendant owned a green baseball cap. She had once worked at a bar in Billings, Montana, where she acquired a gold jacket that had “Oly” written on the front, and on the back, “Western Bar Olympic Drinking Team, Billings, Montana.” At most only about 20 of these jackets existed. Townsend did not wear the jacket herself. Defendant told her he was wearing it. She last saw it in one of defendant’s cars. After she last saw the jacket, around early April 1981, defendant told her it had been stolen. A San Francisco police officer who issued defendant a traffic citation on March 7, 1981, testified defendant was wearing a “yellow windbreaker” containing the logo on the front of either “Coors” or “Olympia beer.” The jacket was never found.
Leland Fritz testified that the back of the gunman’s jacket “said either ‘Olympic’ or ‘Olympia,’ either ‘beer drinking champion’ or ‘team.’ And I was sure of the ‘Montana’ that was underneath it.” When shown a picture of a jacket that Townsend said looked like her jacket, Leland said it had the same “fancy lettering” as the gunman’s jacket. The configuration of the writing was “pretty close” to that of the jacket. Other witnesses observed varying, but lesser, amounts of the writing on the jacket.
The evidence showed that defendant owned two cars timing this time, a Chevrolet station wagon and a red Fiat similar to the car that Leland Fritz and the girl saw speeding away. The day after the Haertle-Hansen shooting, defendant drove the Fiat to the home of an acquaintance in Marin County, borrowed her car, and left the Fiat with her for four days. After defendant’s arrest, a paper bag containing an unexpended .38-caliber bullet was found in the Chevrolet. The bullet had characteristics similar to bullets used in the shootings.
Witnesses testified that the gunman who shot Haertle and Hansen wore tennis shoes. Criminalists took plaster casts and photographs of distinctive shoe tracks at the scene. Evidence showed that the day before the shooting, defendant purchased a pair of Nike shoes with an identical pattern. The shoes themselves were never found.
In October 1980, Anne Alderson was fatally shot in the head from close range near the top of Mount Tamalpais in Marin County. The body was *349 clothed, but the vagina contained sperm. A semen stain on the panties, probably deposited around the time of death, was of a type consistent with about 6 to 8 percent of the general population, including defendant. In November 1980, Cynthia Moreland and Richard Stowers were fatally shot in the head in a heavily wooded area of the Point Reyes National Seashore. The .38-caliber Rossi revolver used in the Santa Cruz County crimes was also used on these occasions.
2. Defense and Rebuttal Evidence
The defense did not dispute that defendant was the gunman,[2] but sought to cast doubt whether defendant lay in wait for Hansen and raped Scaggs. Brian Wraxall, a forensic serologist, testified that the semen found in Scaggs’s vagina could have come from her boyfriend. Two investigators testified about the topography of the area where defendant shot Hansen. Defendant did not testify.
In rebuttal, the prosecution presented evidence regarding the topography and responding to Wraxall’s testimony.
B. Penalty Phase
1. Prosecution Evidence
The prosecution presented evidence of defendant’s other crimes and convictions. In 1960, he assaulted a woman in the Presidio of San Francisco with a knife and hammer, then shot at a police officer with a tear gas gun.
In January and February 1970, defendant went on a crime spree. On January 27, he assaulted a woman at knifepoint on an isolated road in Santa Cruz County, attempted to rape her, and stabbed her three times. The next day, he broke into a private home in the Santa Cruz Mountains and, using a shotgun in the house, abducted the woman who lived there. He tied her hands behind her back, drove her to another spot, and raped her. The morning after that, January 29, he confronted a woman at gunpoint in the carport under her apartment building in Daly City, tied her hands, and stole her car. On February 3, he robbed a woman in Calaveras County at gunpoint, tied her up, and stole her car. Later the same day, he abducted another woman and her infant son at gunpoint from their home in Angels Camp. Holding the gun on the infant, he forced the woman to drive her car to a *350 remote spot, where he raped her. Defendant was also convicted of escaping from the Calaveras County jail.
In addition to the murders of Anne Alderson, Cynthia Moreland, and Richard Stowers, the prosecution proved that in November 1980, defendant fatally shot Shauna May and Diane O’Connell in the head near where he shot Moreland and Stowers. May’s vagina contained sperm. Defendant used the same Rossi revolver each time.
2. Defense Evidence
The defense presented considerable evidence in mitigation. As summarized by appellate counsel, “The defense told Mr. Carpenter’s life story through a large number of lay and expert witnesses, who identified significant themes: Mr. Carpenter was the product of a physically and emotionally abusive home environment which left him with profound psychological impairments. He suffered from a severe speech impediment [stuttering] which exacerbated both the abuse and his psychological difficulties and contributed to his inability to overcome them. The social welfare, mental health, and criminal justice systems repeatedly recognized the type of intensive treatment Mr. Carpenter needed, repeatedly failed to provide it, and instead consigned him to environments which actually reduced his already-limited ability to cope with life outside a highly structured institution. In contrast to his inability to adhere to societal norms while living outside of prison, Mr. Carpenter adjusted extraordinarily well to prison life.”
Several childhood friends and teachers testified about defendant’s troubled childhood, and other friends about his later years. His three adult children testified about their contacts with defendant and their love for him. Several prison employees testified about defendant’s good behavior while incarcerated in state and federal prisons. An expert testified about the effects of child abuse in general and on defendant in particular. Another testified about stuttering and its deleterious effects on defendant. Dr. William Pierce, a psychologist, testified that defendant suffers from a severe and longstanding emotional disturbance amounting to a personality disorder stemming from emotional neglect and abuse in his childhood, which contributed to his criminal behavior. Dr. Craig Haney, another psychologist, testified that penal and other public institutions failed to provide necessary treatment for defendant, beginning when he was a minor, and that this failure contributed to his criminal behavior.
3. Rebuttal
In rebuttal, the prosecution presented testimony from defendant’s first wife, one of his parole officers, and a state rehabilitation counselor; expert *351 testimony disagreeing with some of the defense experts’ opinions; testimony about minor misbehavior by defendant in county jail; and other evidence.
II. Discussion
A. Jury Selection Issues
At defense request, the court selected separate guilt and penalty juries. Defendant contends the court committed numerous errors during the selection.
1. Refusing to Allow Survey Regarding Economic Hardship
Defendant moved to give all prospective jurors a questionnaire regarding “extended jury service and economic hardship.” He stated the questionnaire was necessary “to collect data to support a subsequent motion to augment juror fees,” which would be based upon defendant’s “constitutional right to a jury selected from a fair and representative cross-section of the community.” The questionnaire asked questions such as the sex, age, race, and income of the juror and then asked, “If you were called to serve on a trial which was conducted four days a week and lasted six weeks, and you were paid $20 per week by the court, how difficult would it be for you to serve?” If the responder said it would be “very difficult,” the final question was why. The court denied the motion, in part because the “survey or the information it would glean about prospective jurors would [not] be of any assistance at all.”
Defendant contends this ruling “precluded [him] from establishing that the jury venire in his case did not represent a fair cross-section of the community” in violation of his “state and federal constitutional right to demonstrate that his juries were not drawn from a cross-section of the community.” The Attorney General responds first that defendant waived the claim by failing to object to the panel or to move to quash the venire. (People v. Fauber (1992) 2 Cal.4th 792, 816 [9 Cal.Rptr.2d 24, 831 P.2d 249].) However, defendant does not directly challenge the jury but only argues that the court erred in denying the survey, which prevented him from challenging the jury or asking that the jurors be paid more than the statutory amount of $5 per day. (Code Civ. Proc., § 215.) This issue was litigated below. So understood, the contention was not waived.
The contention, however, lacks merit. The questionnaire could not have significantly aided any potentially meritorious challenge to the jury. “In order to establish underrepresentation, and thus denial of an impartial *352 jury drawn from a fair cross-section of the community, a defendant must make a prima facie showing: ‘(1) that the group alleged to be excluded is a “distinctive” group in the community; (2) that the representation of this group in the venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.’ (Duran v. Missouri (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 99 S.Ct. 664].)” (People v. Harris (1989) 47 Cal.3d 1047, 1077 [255 Cal.Rptr. 352, 767 P.2d 619]; accord, People v. DeSantis (1992) 2 Cal.4th 1198, 1216 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)
As might be expected, many prospective jurors were excused for hardship, although the parties disagree exactly how many. We have already held that persons excused for hardship or persons of low income do not constitute a cognizable class, and that the court need not pay jurors more than the statutory amount. (People v. DeSantis, supra, 2 Cal.4th at pp. 1215-1216; People v. Nicolaus (1991) 54 Cal.3d 551, 570-571 [286 Cal.Rptr. 628, 817 P.2d 893]; see also People v. Mickey (1991) 54 Cal.3d 612, 663-667 [286 Cal.Rptr. 801, 818 P.2d 84].) To the extent defendant argues to the contrary, the argument thus fails.
Defendant also argues he wanted to “develop a correlation between hardship excusáis and unquestioned cognizable classes such as race and sex.” Whether any such correlation would lead to a prima facie showing of a “systematic exclusion” is dubious, but that question is not before us. Nothing prevented defendant from attempting to make that showing. The relevant group in this regard is not the prospective jurors who merely stated on a questionnaire it would be difficult to serve on the jury, but those who were actually excluded for hardship. The questionnaire was neither necessary nor helpful in identifying those who were excluded. As the trial court was correct that the survey would not have assisted defendant, we perceive no abuse of discretion.
2. Alleged Judicial Hostility to Defense Counsel During Jury Selection
Defendant contends that often during jury selection, “the judge addressed defense counsel with inappropriate rancor or attached an overtone of obvious hostility to legal rulings adverse to the defense.” The Attorney General contends defendant waived the contention by not objecting. (People v. Fudge (1994) 7 Cal.4th 1075, 1108 [31 Cal.Rptr.2d 321, 875 P.2d 36].) We disagree. Defense counsel complained about the tone of judicial rulings on a number of occasions and argued the jury would “get the impression as to who is in trouble with the judge.”
*353 The contention, however, lacks merit. A trial court commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution. (People v. Fudge, supra, 7 Cal.4th at p. 1107; People v. Clark (1992) 3 Cal.4th 41, 143 [10 Cal.Rptr.2d 554, 833 P.2d 561].) We have read each of the alleged instances of hostility in context. They fall far short of establishing misconduct or “betray[ing] a bias against defense counsel.” (People v. Wright (1990) 52 Cal.3d 367, 411 [276 Cal.Rptr. 731, 802 P.2d 221].) The record suggests that on occasion during the protracted jury selection process the court showed irritation with counsel’s voir dire questioning, sometimes outside the presence of prospective jurors, sometimes in front of one or more prospective jurors, and perhaps occasionally in front of a juror who actually sat on one of the juries. But we perceive nothing that crossed the line into improper behavior, and certainly nothing prejudicial to the defense cause. The trial court has the duty to control the trial. (Pen. Code, § 1044; People v. Fudge, supra, 7 Cal.4th at p. 1108.) It effectively fulfilled that duty.
3. Restrictions on Voir Dire of Prospective Penally Jurors
Defendant contends the court unduly restricted his questioning of prospective penalty jurors. Under the law that prevailed at trial (it is different now; see People v. Edwards (1991) 54 Cal.3d 787, 829-830, fn. 9 [1 Cal.Rptr.2d 696, 819 P.2d 436]), “counsel should be allowed to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges whether or not such questions are also likely to uncover grounds sufficient to sustain a challenge for cause.” (People v. Williams (1981) 29 Cal.3d 392, 407 [174 Cal.Rptr. 317, 628 P.2d 869].) In Williams, we “[left] intact the considerable discretion of the trial court to contain voir dire within reasonable limits.” (Id. at p. 408; see also People v. Edwards, supra, 54 Cal.3d at p. 829; People v. Mason (1991) 52 Cal.3d 909, 939 [277 Cal.Rptr. 166, 802 P.2d 950].)
We have reviewed the restrictions and find each came within the court’s discretion. The court generally allowed defense counsel to question jurors at length. For example, the voir dire of the first juror defendant discusses, who actually served on the jury, consumed 51 pages of reporter’s transcript, of which about 35 pages was defense questioning. The occasional restriction regarding specific questions was proper to contain the voir dire within reasonable limits. At one point, defense counsel asked to use a written questionnaire (different from the previously discussed one that concerned hardship). The court denied the request. Although a written questionnaire may sometimes be helpful, we have never required its use, and the court did *354 not abuse its discretion in refusing this one. At another point, two prospective jurors who had already been examined were returned for further examination regarding their attitudes towards the death penalty. The court limited both sides to 15 minutes per juror for the reopened questioning. After the questioning, the defense complained the time was inadequate. The court disagreed, stating as to the first juror, “You reach a point where we are just wasting time to ask somebody the same question over and over and over again, and get the same answer.” Neither this ruling nor any of the others was unreasonable. (People v. Lucas (1995) 12 Cal.4th 415, 480 [48 Cal.Rptr.2d 525, 907 P.2d 373] [no abuse of discretion in disallowing further questioning “because the subject had been exhausted”].) From our review of the record, “It does not appear counsel was prevented from making reasonable inquiry into the fitness of any venire person to serve on the jury.” (People v. Wright, supra, 52 Cal.3d at p. 419, original italics.)
Moreover, we find no prejudice even if we assume an occasional abuse of discretion. In People v. Bittaker (1989) 48 Cal.3d 1046, 1086 [259 Cal.Rptr. 630, 774 P.2d 659], the court imposed far greater restrictions than in this case, but we found that we should “limit reversals to those cases in which the erroneous ruling affected defendant’s right to a fair and impartial jury.” As in Bittaker, any error was harmless here. The rulings were minimally restrictive. Moreover, the defense had several peremptory challenges remaining when it accepted the jury, and it did not express dissatisfaction with the jury as sworn. “When the jury was finally selected, defendant did not claim that any juror was incompetent, or was not impartial. We therefore find no prejudicial error.” (People v. Bittaker, supra, 48 Cal.3d at p. 1087; see also People v. Avena (1996) 13 Cal.4th 394, 413 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; People v. Pinholster (1992) 1 Cal.4th 865, 916 [4 Cal.Rptr.2d 765, 824 P.2d 571].)
Defendant also argues the combination of the restrictions and the court’s hostile attitude was prejudicial. We disagree. There was no error to accumulate.
4. Guilt Jury Selection
Defendant challenges several rulings during selection of the guilt jury. He contends the court erroneously excused one prospective juror for cause without allowing defense counsel to question him. After that juror expressed opposition to the death penalty, the court asked, “Are you so opposed to the death penalty that you could not find a man guilty or find that special circumstances were true because somebody else might impose the death penalty if you did?” The juror answered, “Yes.” The court explained *355 that the juror would not be called upon to decide penalty but only guilt, and that, if the guilt verdict warranted it, another jury would decide the punishment. When the court asked if the juror could “be fair in deciding is he guilty or not, knowing that if you did find him guilty, somebody else might say the death penalty,” the juror answered, “I don’t think I can.” Upon further questioning, he said he could not vote for guilt under such circumstances even if he were convinced beyond a reasonable doubt the defendant was guilty. He could not vote guilty “if it is a decision between, you know, life in prison or death. Maybe it would appear different if I knew which one they were going to do, you know. Maybe it would be different.” Finally the court asked, “You feel so strongly that your conscience just wouldn’t let you do anything else?” The juror answered, “Yes, that’s true.” The court refused to allow defense counsel to ask questions and excused the juror for cause.
Defendant claims the questions were improper and the answers inadequate to support the challenge for cause. We disagree. “If the offense charged [is] punishable with death, the entertaining of such conscientious opinions as would preclude [the juror’s] finding the defendant guilty” is grounds to remove the juror for cause. (Pen. Code, former § 1074, subd. (8), repealed by Stats. 1988, ch. 1245, § 34, p. 4155, now Code Civ. Proc., § 229, subd. (h).) The questions were reasonably directed to determining whether to excuse the juror under this standard, and the record amply supports the court’s ruling. (People v. Wash (1993) 6 Cal.4th 215, 256 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)
Defendant also argues that the court “committed an even more basic error by excusing [the juror] prior to questioning by defense counsel.” Again, we disagree. The court has discretion to refuse to allow defense counsel to question jurors for the purpose of rehabilitation if their “answers made their disqualification unmistakably clear ....’’ (People v. Bittaker, supra, 48 Cal.3d at p. 1085, citing People v. Nye (1969) 71 Cal.2d 356, 364 [78 Cal.Rptr. 467, 455 P.2d 395].) “We do not question a judge’s discretion to decide that a juror’s disqualification is so clear that further voir dire is pointless, and to excuse the juror . . . .” (People v. Bittaker, supra, at p. 1085.) Defendant argues that in some respects the juror’s answers were equivocal, but as a whole the juror made clear he could not find defendant guilty if the death penalty were possible. We find no abuse of discretion.
Defendant next argues the court erroneously denied two defense challenges for cause. Our review of the record discloses no error, but even if we assume error as to both, defendant has failed to show prejudice. Defendant peremptorily challenged both jurors and did not exhaust his challenges. He did not express dissatisfaction with the ultimate jury. “Any erroneous *356 inclusion of prospective jurors was therefore harmless.” (People v. Edwards, supra, 54 Cal.3d at p. 830.)
One prospective juror stated in front of other prospective jurors, “I am terrified, and would like to be excused from this case.” At a bench conference, the court observed that the juror “appears to me to be very visibly upset, very nervous, shaking.” Without objection, the court excused the juror. Defense counsel asked the court to “make it clear to these other people that her fear has nothing to do with anything in this case,” arguing that “[t]hey may form a conclusion that some kind of thing happened from us that makes her fearful.” The court refused the request. Defendant claims, “Without a cautionary instruction, it is reasonably probable that the remaining jurors speculated whether [the juror’s] fear was justified and could, be laid at Mr. Carpenter’s feet.” We disagree. The juror expressed a generalized fear of sitting in a case such as this, not a specific fear of defendant. The trial court was in the best position to judge the need or advisability of a cautionary instruction. We find no abuse of discretion.
Defendant also contends the court erred in excusing one juror for hardship after the guilt jury had been selected. A substantial delay ensued between the selection of the guilt jury and the beginning of the actual trial. When the trial began, but before the guilt jury was sworn, one of the selected jurors asked to be excused. She stated that her employer, a large business, had recently changed its policy and would no longer pay for her jury time. Defense counsel asked if a “phone call from the judge” would help. She answered, “I don’t know. They said, when I talked to the manager, ... he said that if he had to pay, he would pay, and they would take a loss on it. [<H] So I think they kind of know that they are trying to pull a fast one, because he didn’t want me to serve . . . .” Both sides asked the court to call the employer, but the court declined, observing, “I have no reason to believe that I could have any persuasive powers involving” the company. It explained that normally such a call would be made by a jury coordinator and expressed concern over yet more delay in commencing the trial. It excused the juror and replaced her with an alternate.
Defendant argues the court should have called the employer. The court had no such duty. Excusal of the juror, even after she had been chosen to serve, was within the discretion of the court. (People v. Lucas, supra, 12 Cal.4th at pp. 487-489.) Defendant also complains of “glaringly different treatment” when, a short time later, the court did call the employer after a penalty juror expressed a similar concern. The second situation, however, was different. That juror said the employer might still consider paying her. Defendant also argues that because the jury was not yet sworn, he had the *357 right to reopen jury selection and use his remaining peremptory challenges. (People v. Armendariz (1984) 37 Cal.3d 573, 578-584 [209 Cal.Rptr. 664, 693 P.2d 243].) He did not, however, request to do so or express dissatisfaction with the remaining jurors. He may not complain on appeal of the court’s failure to do what he did not request. (People v. Caro (1988) 46 Cal.3d 1035, 1046-1047 [251 Cal.Rptr. 757, 761 P.2d 680].)
5. Penalty Jury Selection
Defendant also challenges several rulings during selection of the penalty jury. He contends the court erred in excusing 11 jurors for cause. A prospective juror may be excused for cause if that juror’s views on the death penalty “would ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ” (Wainwright v. Witt (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841]; see People v. Rodrigues (1994) 8 Cal.4th 1060, 1146 [36 Cal.Rptr.2d 235, 885 P.2d 1].) We apply this standard even though trial occurred before Wainwright v. Witt, supra, 469 U.S. 412, was decided. (People v. Mitcham (1992) 1 Cal.4th 1027, 1061 [5 Cal.Rptr.2d 230, 824 P.2d 1277]; People v. Mickey, supra, 54 Cal.3d at pp. 680-681.) On review, if the juror’s statements are equivocal or conflicting, the trial court’s determination of the juror’s state of mind is binding. If there is no inconsistency, we will uphold the court’s ruling if it is supported by substantial evidence. (People v. Mayfield (1997) 14 Cal.4th 668, 727 [60 Cal.Rptr.2d 1, 928 P.2d 485] [this standard applies even though the trial court used the stricter test of Witherspoon v. Illinois (1968) 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776]; People v. Mitcham, supra, 1 Cal.4th at p. 1061.)
Defendant contends the court erroneously “instructed [each] juror that a death verdict was mandatory if aggravation outweighed mitigation.” (See People v. Brown (1985) 40 Cal.3d 512, 538-544 [220 Cal.Rptr. 637, 709 P.2d 440].) The record shows otherwise. Although the explanations given the jurors during the selection process “were not intended to be, and were not, a substitute for full instructions at the end of trial” (People v. Edwards, supra, 54 Cal.3d at p. 840), the court made clear the jurors had to engage in a weighing process. It never suggested the death penalty was mandatory. For example, the court explained to the first of the 11 jurors, “The jury will be told that you are to hear both aggravating and mitigating evidence and you are to decide which evidence is the most convincing to you. And you are then to make your selection of penalty appropriately with the way you find that evidence to weigh.” Defendant claims the court “compounded the error” as to three jurors by not allowing defense counsel to ask questions “which stated the sentencing formula correctly.” We disagree. *358 There was no error to compound, and the court merely sustained objections to specific questions it found misleading or ambiguous. It did not prevent the defense from effectively pursuing the subject.
Defendant contends the answers of five of the jurors do not support their excusal. Our review of the record convinces us otherwise. The rulings come within the trial court’s wide discretion to determine the qualifications of jurors. (People v. Rodrigues, supra, 8 Cal.4th at p. 1146.) Although some of the jurors were more equivocal than others, the voir dire as a whole supports each of the rulings. (People v. Livaditis (1992) 2 Cal.4th 759, 772-773 [9 Cal.Rptr.2d 72, 831 P.2d 297].)
Defendant contends the court committed an additional error as to two of the excused jurors. After the individual voir dire concerning the death penalty, the parties did not challenge either of the two. Later, during final stages of jury selection, the court asked the entire remaining jury panel whether anyone’s “attitude has changed toward serving on a panel that may be called upon to assess a penalty in this case.” One of the two jurors raised her hand. The second sent the court a note saying, “After long, careful thought, I know that I could not vote for the death penalty.” Over defense objection, the court and parties requestioned both individually. The court excused them for cause because of their newly expressed views on the death penalty. Defendant argues the court should not have reopened the questioning. We disagree. Weeks had passed since the individual questioning, and it was reasonable to ask if anyone’s views had changed. Indeed, defense counsel asked the same panel if anyone had been victimized by a violent crime since the previous questioning, even though the subject had already been explored. This question elicited a response that led to a juror’s excusal. Defendant also argues the court violated the rule of Hovey v. Superior Court (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301] that questions regarding the death penalty be asked of the jurors individually. However, the court asked the panel as a whole only whether anyone’s attitude had changed. The subsequent questioning was individual. As the court stated, “nobody has been asked their attitude about the death penalty in the presence of anyone else at any time.”
Defendant also contends the court erroneously denied several defense challenges for cause. As with the similar guilt jury contention, our review of the record discloses no error, but defendant has failed to show prejudice even if we assume error. Defendant peremptorily challenged the jurors in question and neither exhausted his peremptory challenges nor expressed dissatisfaction with the ultimate jury. (People v. Crittenden (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Defendant finally contends that *359 the court showed bias in favor of the prosecution by inconsistently granting one prosecution challenge for cause and denying an assertedly similar defense challenge for cause. The two situations were, however, different and warranted different rulings. The court treated both parties fairly during jury selection.
6. Reference to Governor’s Commutation Power
During the individual voir dire of one prospective penalty juror, defense counsel stated, “Life without the possibility of parole . . . means just what it says, lock them up, throw away the key, never get out.” When the juror asked, “They don’t ever come to court again, right?” and “They are in prison for life?” defense counsel responded, “Right.” The district attorney objected. The court then explained, “A sentence of life without the possibility of parole means exactly what it says. In other words, you are sentenced to life in prison, period. There is no release date set. There is no possibility of a parole hearing being held. [U . . . There is always a possibility that the governor of the state has the power to commute any sentence, including a death sentence. [*J0 . . . But the sentence of life in prison without the possibility of parole means exactly that, that you are sentenced to serve the rest of your life in prison. The law was first adopted in 1977, and to the best of my knowledge nobody has ever been released who has been so sentenced under that law.”
At a bench conference immediately following these remarks, defense counsel stated, “I just want to make clear we will object to that instruction being given and I didn’t want to waive that for the record. I want to reinforce that with the court.” The court responded that “the instructions on the law will be given to the jury at the time the instructions are given. Ffl] The problem here is that people ask these questions because of the way in which the voir dire is being conducted and they have to be answered. And I gave her the best answer that I can. But this does not have anything to do with what instructions are going to be given.” Defense counsel stated, “You could tell her the last time the governor commuted any one—that the probability of a pardon is minuscule.” The court declined to do so. The questioning of the juror recommenced with no further mention of the Governor’s commutation power. The juror sat on the actual penalty jury.
Defendant contends the court erred in referring to the Governor’s commutation power. He relies largely on People v. Ramos (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], where we held that a statutorily mandated instruction on the Governor’s power to commute a life sentence— the so-called “Briggs instruction”—violated the California Constitution. (Cf. *360 California v. Ramos (1983) 463 U.S. 992 [103 S.Ct. 3446, 77 L.Ed.2d 1171] [upholding the same instruction against federal constitutional challenge].)
The Attorney General responds first that defendant has not preserved the claim. We agree in part. Defendant cites his attorney’s statement at the bench conference that “we will object to that instruction.” In context, however, the statement referred to a future objection to the Briggs instruction itself. The court and defense clearly understood it as such. (The Briggs instruction was never given.) Defendant did not object to the explanation the court gave the prospective juror. He has thus waived the right to challenge that explanation on appeal. The defense did, however, request the court to explain it was unlikely the Governor actually would commute any sentence. Defendant may thus challenge the court’s refusal to do so. But the court did not err. The likelihood the Governor will commute a sentence cannot be quantified. The statement that no one had yet been released who received a life without parole sentence suggested commutation was unlikely. The court did not abuse its discretion when it refused to elaborate.
The entire explanation was also not erroneous. The court evenhandedly referred to the power to commute any sentence, including death, and thus avoided one of the key failings we found in the Briggs instruction. (People v. Ramos, supra, 37 Cal.3d at pp. 153-155.) Given defense counsel’s somewhat misleading statement that a person receiving a sentence of life without possibility of parole could never be released, the brief explanation of the possibility of commutation was reasonable. It did not suggest the jurors should consider that possibility or invite them to speculate on what the Governor might do.
Defendant complains the court did not explain that, because of his prior record, the Governor’s power to commute his sentence was limited. (See People v. Hamilton (1988) 45 Cal.3d 351, 374 [247 Cal.Rptr. 31, 753 P.2d 1109].) However, the court merely referred to the “possibility” the Governor had the power to commute. There was no need to discuss the law of commutation exhaustively and good reason not to stress defendant’s record. Defendant also complains the court did not specifically tell the juror not to consider the possibility of commutation. This admonition may make error in giving the Briggs instruction harmless (People v. Coleman (1988) 46 Cal.3d 749, 781-782 [251 Cal.Rptr. 83, 759 P.2d 1260]), but the court did not give the Briggs instruction. Because the court did not suggest the juror should consider the commutation power, it did not need to instruct her not to.
Any error was also harmless. The court only briefly mentioned the commutation power once during voir dire, long before deliberations began. “[W]hen the commutation power is mentioned at voir dire, the jury’s *361 attention is not narrowly focused on its duty to select a penalty, and the potential for prejudice is slight.” (People v. Pinholster, supra, 1 Cal.4th at p. 918 [three of the actual jurors were asked questions about the commutation power]; see also People v. Lucas, supra, 12 Cal.4th at pp. 483-484.) The defense accepted the juror when it had peremptory challenges remaining, thus suggesting it did not believe the reference to the commutation power was harmful.
Defendant also relies on Hamilton v. Vasquez (9th Cir. 1994) 17 F.3d 1149, 1159-1164, which, disagreeing with our contrary conclusion in People v. Hamilton, supra, 45 Cal.3d at pages 372-376, found a modified version of the Briggs instruction to be prejudicial error. That decision has no relevance here. The instruction in that case (see 17 F.3d at pp. 1161-1162), given to the entire jury just before deliberations, bears no resemblance to the brief explanation of this case, and the reasons the federal court gave for setting aside the judgment do not apply here.
B. Pretrial Issues
1. Denial of Severance
Defendant moved to sever the counts involving Hansen and Haertle from those involving Scaggs. The court denied the motion, finding that “these cases are so connected because of that ballistics issue that, in my opinion, there really is no serious issue here.” Defendant contends the court erred. The court, however, acted within its discretion. (People v. Osband (1996) 13 Cal.4th 622, 666 [55 Cal.Rptr.2d 26, 919 P.2d 640].)
Our analysis can start and stop with the question whether evidence of one incident would have been admissible at a trial of the other, for it is “dispositive” in this case. (Frank v. Superior Court (1989) 48 Cal.3d 632, 639 [257 Cal.Rptr. 550, 770 P.2d 1119].) Although the absence of cross-admissibility does not necessarily compel severance (People v. Bean (1988) 46 Cal.3d 919, 938-940 [251 Cal.Rptr. 467, 760 P.2d 996]), “Joinder is generally proper when the offenses would be cross-admissible in separate trials, since an inference of prejudice is thus dispelled.” (People v. Arias (1996) 13 Cal.4th 92, 126 [51 Cal.Rptr.2d 770, 913 P.2d 980]; see also People v. Davis (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119].)
Evidence of both incidents would have been admissible at separate trials of each. The ballistics evidence showed that the same gun was used each time, strongly indicating that the same person committed each crime. Thus, *362 evidence that defendant was the gunman in one incident was evidence that he was the gunman in the other. The evidence of identity was strong for both incidents. Regarding the Hansen/Haertle crimes, there were multiple eyewitness identifications, evidence regarding the distinctive jacket both the gunman and defendant wore, shoeprint evidence, and evidence that defendant owned a car similar to the gunman’s. Regarding the Scaggs crimes, the morning of the day she disappeared, defendant was scheduled to drive her to the very area where her body was later found. As the trial court stated, the question of severance was not close. (People v. Medina (1995) 11 Cal.4th 694, 748-749 [47 Cal.Rptr.2d 165, 906 P.2d 2] [“[T]he ballistic evidence alone probably would have been sufficient to justify admission of the ‘other crimes’ evidence.”].)
Defendant also claims that denial of severance denied him equal protection. He did not make this contention at trial, so he may not raise it for the first time on appeal. (People v. Champion (1995) 9 Cal.4th 879, 906 [39 Cal.Rptr.2d 547, 891 P.2d 93].) The contention also lacks merit. Defendant argues that because the truth of a prior murder conviction special circumstance is tried separately (Pen. Code, § 190.1, subds. (a), (b)), so must a murder charge. Like persons who have already been convicted, he claims, he must not be forced simultaneously to defend against two murder charges. We disagree. Persons with prior convictions are situated differently from persons not yet convicted. A person with a prior conviction has already been tried and thus need not be retried. Under any standard, the Legislature may properly distinguish between a person already convicted and a person not yet convicted.
2. Search and Seizure Issues
Defendant moved to suppress various items of evidence. The court granted the motion in part but denied most of it. Defendant contends the court erred in the part it denied. As these crimes were committed before the 1982 adoption of Proposition 8, its provisions do not apply. (People v. Diaz (1992) 3 Cal.4th 495, 520, fn. 4 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; People v. Smith (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149].)
Defendant contends a warrant obtained in San Francisco on May 15, 1981, for the search of his home, person, and cars was invalid because the supporting affidavits contained material misstatements and omitted material facts. “Under the law applicable to this case, a defendant may seek to suppress evidence on the ground that the affidavit supporting the search warrant contained inaccurate statements. If, however, the affiant acted reasonably in including the misstatements in the warrant application, no *363 sanction is imposed. If the affiant was negligent, or unreasonably believed the statements to be true, the reviewing court must correct the inaccurate information and ‘retest’ the reformulated affidavit for probable cause. And if the affidavit contained reckless falsehoods or deliberate lies, the warrant must be quashed, regardless of whether the false statements were necessary to establish probable cause.” (People v. Diaz, supra, 3 Cal.4th at p. 520, fn. omitted.)
“In People v. Kurland (1980) 28 Cal.3d 376 [168 Cal.Rptr. 667, 618 P.2d 213], this court articulated the standards which apply when a search warrant is attacked on the ground that it is incomplete. First, the reviewing court must determine whether any of the asserted omissions are material. (Id., at p. 387.) Omissions are ‘material’ if the affidavit was rendered substantially misleading, i.e., if there was ‘a substantial possibility [the omitted facts] would have altered a reasonable magistrate’s probable cause determination.’ (Id., at p. 385.) If the asserted omissions are deemed immaterial and the affidavit on its face supports probable cause, the warrant usually stands. (Id., at p. 387.) [U If a material fact is reasonably omitted, no sanction is imposed. (Kurland, supra, 28 Cal.3d at p. 388.) If a material fact is negligently omitted, the reviewing court should view the affidavit as if it had included that fact and retest it for probable cause. (Ibid.) Lastly, if a fact is recklessly omitted or omitted with an intent to mislead, the warrant should be quashed, regardless of whether the omission is ultimately deemed material. (Id., at p. 390.)” (People v. Aston (1985) 39 Cal.3d 481, 497-498 [216 Cal.Rptr. 771, 703 P.2d 111].)
The superior court properly upheld the warrant under these rules. The affidavits of two investigating police officers and Townsend, the person who had been living with defendant, and various police reports supported the warrant. The officers’ declarations included information that defendant was a coworker of Scaggs and had made plans to take her to Santa Cruz the day she disappeared; defendant drove a red Fiat similar to descriptions of the gunman’s car; Kenneth Fritz described the gunman as wearing Nike athletic shoes (but noted also that Haertle described the “shoes as being of a different brand”); and defendant began to grow a beard around the time of the Haertle/Hansen shooting. Townsend’s declaration stated that defendant purchased Nike athletic shoes shortly before the shooting and wore her distinctive jacket from Billings, Montana, that was similar to the gunman’s jacket.
Based on the transcript of a recorded police interview with Townsend before the warrant and her testimony at the suppression hearing a year after the warrant, defendant argues the affidavits contain material misstatements. We have reviewed each contention and find none has merit. For example, *364 Townsend testified she last saw the jacket “the end of April.” Her affidavit said defendant told her “between late March and early April, 1981,” that he was wearing the jacket, that shortly afterward she actually saw it in one of his cars, and that “later” he said it had been stolen. No inconsistency appears here. One of the officers’ affidavits did indicate Townsend said defendant claimed the jacket was stolen “near the end of March and before April.” But any inconsistency between the affidavit and Townsend’s testimony a year later is trivial, and there is no reason to suspect the officer incorrectly reported what she said at the time of the warrant. Defendant also argues the affidavits contain information from Townsend not mentioned in the recorded interview. But Townsend spoke with the officers at times other than the recorded interview. At the suppression hearing, Townsend confirmed the correctness of her affidavit.
Defendant also contends information regarding charges pending against Townsend in Montana and other charges against her alleged “boyfriend” was improperly omitted from the affidavits. Again, we disagree. Even assuming the declarants knew of this information, it was not material; its omission did not render the affidavit substantially misleading. The same is true of the other claimed omissions. The affidavits were accurate, fair (for example, one pointed out the discrepancy in the witnesses’ description of the gunman’s shoes), and presented far more information than the minimum necessary to establish probable cause.
Defendant also contends the search exceeded the scope of the warrant. He specifically mentions the seizure of a pair of athletic shoes (not the shoes the gunman wore). The warrant authorized the seizure of clothing, so it appears the shoes came within its scope, but even if not, the seizure was lawful. A person executing a search warrant may seize items not described in the warrant that are observed in plain sight if a “ ‘nexus’ ” exists between those items and criminal behavior, i.e., if there is “ ‘probable cause ... to believe that the evidence sought will aid in a particular apprehension or conviction.’ ” (People v. Hill (1974) 12 Cal.3d 731, 762 [117 Cal.Rptr. 393, 528 P.2d 1]; see also Horton v. California (1990) 496 U.S. 128 [110 S.Ct. 2301, 110 L.Ed.2d 112].) This nexus existed here. The officer who seized the shoes testified that their soles were “somewhat compatible” with cast impressions of the gunman’s shoes.
Defendant next challenges the seizure and subsequent search of his Chevrolet station wagon. The San Francisco warrant authorized its search, but when the police located it, a third party was driving it in Alameda County. The police seized the car but did not search it until they obtained a new warrant in that county. A showing similar to that of the first warrant *365 supported the second warrant. Defendant claims the affidavits improperly omitted information from Townsend that defendant “may” have loaned the car to a third person. Although this information may have been relevant, its omission did not render the affidavit substantially misleading. Defendant also argues that the San Francisco warrant “was not valid to authorize a seizure in Alameda County.” We need not decide that question. The police had probable cause to search the vehicle. Under the “automobile exception” to the warrant requirement, they did not need a warrant at all. (United States v. Ross (1982) 456 U.S. 798 [102 S.Ct. 2157, 72 L.Ed.2d 572]; People v. Superior Court (Valdez) (1983) 35 Cal.3d 11, 15-16 [196 Cal.Rptr. 359, 671 P.2d 863].) The fact the police cautiously obtained a second warrant does not change this.
Defendant argues the unexpended .38-caliber bullet from the Chevrolet should have been suppressed for an additional reason. The car was towed to a commercial garage, where the police searched it after obtaining the Alameda County warrant. An officer found the bag containing the bullet in the car but then left it behind on a workbench in the garage. Almost two weeks later, a garage employee informed the officer that the bag was still there. The officer returned to the garage and seized the bag. Defendant contends that because the return to the search warrant had already been filed, the later seizure was unlawful. We disagree. The officer had the right to search and seize the bag when the car was originally searched. The fact the officer left it in the garage for several days did not increase the invasion of defendant’s privacy and did not make unlawful what would originally have been lawful. (People v. Justin (1983) 140 Cal.App.3d 729, 740-741 [189 Cal.Rptr. 662].)
Soon after Scaggs disappeared, the police learned that defendant was on parole and that his counselor at the State Department of Rehabilitation was Neil Nevesny. After police arrested defendant, they found a business card bearing Nevesny’s name, address, and telephone number in defendant’s wallet. On May 29, 1981, the police obtained a warrant authorizing a search of the State Department of Rehabilitation for “any records, documents, papers, and case file, for David Joseph Carpenter, and any other information in possession of Mr. Neal [sz'c] Nevesny regarding David Joseph Carpenter.” The police also obtained various state and federal prison and parole records regarding defendant, including medical and psychiatric records. The prosecution used some of this information, including testimony of Nevesny and expert witnesses, in its penalty phase rebuttal evidence. Defendant contends that the warrant was overbroad and based on information obtained in violation of privacy regulations, and that the seizure of the records violated various statutes and regulations and his constitutional right *366 to privacy. We perceive no unlawful behavior, but we need not consider defendant’s myriad arguments in detail. Because defendant presented extensive penalty phase evidence about his psychological condition and history with penal and other public institutions, the prosecution would inevitably have obtained access to the records on these same subjects already in the custody of governmental agencies.
Defendant also contends the police unlawfully seized business records without a warrant. The only evidence introduced at trial that he specifically challenges is a document indicating he had a smog check for his Fiat at Montgomery Ward on March 28,1981, the day before the shooting of Hansen and Haertle. The document corroborated other testimony that defendant purchased a pair of shoes similar to the gunman’s while the car was being checked. Defendant assumes, but does not demonstrate, that this document was obtained from Montgomery Ward rather than some other source, such as his own residence. In opposing the suppression motion, the district attorney stated, “To this date the prosecution is not aware that any records were seized from Montgomery Wards and the prosecution does not, to the best of our knowledge, possess any such records.” The prosecution introduced the document without objection, and nothing in the appellate record indicates it came from Montgomery Ward. Defendant has therefore established no relationship between the document and unlawful police activity. (People v. Superior Court (Keithley) (1975) 13 Cal.3d 406, 411 [118 Cal.Rptr. 617, 530 P.2d 585].) In any event, the document was insignificant in light of the other evidence. There was additional, far stronger evidence that defendant purchased the shoes, and the shoe evidence itself was only one small part of the overwhelming evidence of defendant’s identity as the gunman.
3. Denial of Motion to Suppress Identification Evidence
On May 15, 1981, after defendant’s arrest, several witnesses viewed him in a six-man physical lineup at the Santa Cruz County Sheriff’s Department. Two defense attorneys were present. Defendant moved to suppress the eyewitness identification evidence. The court denied the motion after an evidentiary hearing. Defendant argues (1) the lineup was impermissibly suggestive, and the subsequent identifications were unreliable, and (2) he was denied his right to the assistance of counsel at the lineup.
“In deciding whether an extrajudicial identification is so unreliable as to violate a defendant’s right to due process, the court must ascertain (1) ‘whether the identification procedure was unduly suggestive and unnecessary,’ and, if so, (2) whether the identification was nevertheless reliable *367 under the totality of the circumstances. (People v. Gordon (1990) 50 Cal.3d 1223, 1242 [270 Cal.Rptr. 451, 792 P.2d 251].)" (People v. Wash, supra, 6 Cal.4th at p. 244.) Whether we review deferentially or independently the trial court's finding regarding suggestiveness (see People v. Johnson (1992) 3 Cal.4th 1183, 1216-1217 [14 Cal.Rptr.2d 702, 842 P.2d 1]), defendant's contentions lack merit.
Defendant claims various physical differences between him and other participants made the lineup impermissibly suggestive. We disagree. Because human beings do not look exactly alike, differences are inevitable. The question is whether anything caused defendant to “stand out” from the others in a way that would suggest the witness should select him. (See People v. Johnson, supra, 3 Cal.4th at p. 1217.) There was nothing here. All six participants were bearded and wore identical clothing. Defendant was neither the oldest nor the youngest of the participants, neither the tallest nor the shortest, neither the heaviest nor the lightest. The trial court, who observed each of the six in person, found that, with one exception, the others resembled defendant “very much.” Whatever may be the standard of review of the ultimate question of suggestiveness, this specific factual finding is binding on an appellate court that cannot personally view the participants. In addition, our review of photographs of the lineup supports the trial court’s assessment.
Defendant complains that the beards of the other participants were thicker than his. He started growing his beard after the Hansen-Haertle shooting, some six weeks before the lineup. After viewing the lineup, Steven Haertle commented that the others could not have grown their beards in such a short time period. This alone did not make the lineup impermissibly suggestive. Because the gunman was clean shaven, those who conducted the lineup at first wanted all the participants, including defendant, also to be clean shaven. Defense counsel expressed concern about having defendant shave, and it was decided to have everyone bearded. About 12 to 15 persons with beards were reviewed for possible inclusion in the lineup, and a conscious attempt was made to select those with beards as similar to defendant’s as possible. Judging from the photographs of the lineup, the attempt was quite successful. The beards of the others were not obviously longer or thicker than defendant’s. “Minor differences in facial hair among the participants did not make the lineup suggestive.” (People v. Johnson, supra, 3 Cal.4th at p. 1217.) Indeed, it would be virtually impossible to find five others who had started growing their beards six weeks earlier and who also sufficiently resembled defendant in other respects. We agree with the trial court that, as a whole, the lineup was not “unduly suggestive.”
Defendant also complains that Haertle and possibly others heard on the radio that an arrest had been made before they viewed the lineup. This radio *368 announcement did not make the procedure suggestive. Anyone asked to view a lineup would naturally assume the police had a suspect. (People v. Meneley (1972) 29 Cal.App.3d 41, 57 [105 Cal.Rptr. 432].) The police said nothing suggesting the witnesses should make a selection. Moreover, Haertle testified that although he assumed there was a suspect, he did not know the suspect would be in that lineup instead of a possible later one.
Defendant complains that at the preliminary hearing he was required to wear an orange jail jumpsuit instead of street clothes. His dress on a later occasion did not make the earlier lineup suggestive. We have never extended the rules regarding extrajudicial identifications to subsequent identifications in court, and defendant cites no authority doing so. The lineup itself protected defendant’s rights.
Although two defense attorneys attended the lineup, defendant contends his right to their assistance was violated in two respects: (1) his attorneys were not given adequate time to review the police reports and, therefore, were not aware of the witnesses’ statements; and (2) the attorneys were not allowed to be present at interviews with the witnesses just before and after the lineup. The interviews were tape-recorded. Arthur Danner, the district attorney who was present at the lineup, testified that prosecutors wanted to tape-record the witnesses’ statements, and the lineup itself was not “conducive” to such recording. The interviews occurred only “after any witnesses made any type of identification.”
We perceive no violation of defendant’s right to have an attorney present at the lineup. (Gilbert v. California (1967) 388 U.S. 263 [87 S.Ct. 1951, 18 L.Ed.2d 1178]; United States v. Wade (1967) 388 U.S. 218 [87 S.Ct. 1926, 18 L.Ed.2d 1149]; People v. Mitcham, supra, 1 Cal.4th at p. 1066.) The attorneys were active at the lineup. They participated in the decision not to have defendant shave and successfully requested that a person other than defendant wear his glasses. Defendant cites no authority that defense counsel must be given time to scrutinize the police reports before the lineup. The rules requiring the presence of counsel “were adopted for two primary reasons: to enable an accused to detect any unfairness in his confrontation with the witness, and to insure that he will be aware of any suggestion by law enforcement officers, intentional or unintentional, at the time the witness makes his identification.” (People v. Williams (1971) 3 Cal.3d 853, 856 [92 Cal.Rptr. 6, 478 P.2d 942].) These purposes were satisfied. The defense attorneys could fully detect any unfairness or suggestiveness. Indeed, one admitted at the suppression hearing that no one at the lineup suggested a witness should select a particular person.
Defendant argues that People v. Williams, supra, 3 Cal.3d 853, mandates that his attorneys be present at the postlineup interviews. “In Williams, the *369 defendant’s attorney was present in the viewing room with the witness while the lineup was being conducted. The witness then was taken outside the viewing room for the purpose of making his identification. The request of the defendant’s counsel to be present and observe any identification made by the witness was denied as being against the policy of the sheriff’s department. We held that under the circumstances of the particular case, the exclusion of defense counsel from the actual identification violated the defendant’s right under Wade and Gilbert to have counsel present at the lineup.” (People v. Mitcham, supra, 1 Cal.4th at p. 1067, original italics.) As in Mitcham, we find no violation of this rule. The right to counsel extends only to the actual identification, not to postidentification interviews. (Id. at pp. 1067-1068.) In Mitcham, the interview occurred a week after the lineup; here they occurred just after the viewing and, in some cases at least, while the lineup was still being conducted with other witnesses. This difference does not mandate a different result. In both cases, defense counsel observed the actual identifications. No more is required. Moreover, recording the interviews minimized the concerns that led to the adoption of the Williams rule.
Defendant also sought to challenge the procedure whereby Leland Fritz and the 12-year-old girl first identified his red Fiat. The court refused to take evidence on that question, ruling that, although at trial defendant could fully probe any suggestiveness in the identification process, it would go “to the weight rather than the admissibility of the evidence.” The court was correct. (People v. Edwards (1981) 126 Cal.App.3d 447, 456-457 [178 Cal.Rptr. 876].)
C. Guilt Phase Issues
1. Presence of Penalty Jury
a. Factual Background
Before trial, defendant moved to have separate guilt and penalty juries. The court granted the motion and, in a separate letter, stated that it anticipated hearing motions between any “finding of guilt and the impaneling of the penalty phase jury.” Later the court explained that, despite this language, it intended to select both juries at the outset and have both present in the courtroom during the guilt phase. Defendant moved to reconsider, arguing that there should be two completely separate trials, with the penalty jury selected only after there was a guilt verdict mandating a penalty trial. Dr. Haney, the psychologist who later provided penalty phase mitigating evidence, testified in support of the motion. The court denied the motion. Over *370 defendant’s objection, it also chose to select the penalty jury before the guilt jury because that process would take longer.
The penalty jury sat in the courtroom during the guilt trial. The court informed the prospective guilt jurors that the purpose was “to avoid the possible repetition of evidence.” “If, and only if,” the court explained, the guilt jury “finds the defendant guilty of one or more murders in the first degree and in addition finds beyond a reasonable doubt that one or more of the special circumstances is true, then another jury in another hearing will consider the matter of penalty. The first jury, the guilt or innocence jury, will be discharged and have no responsibility for determining the penalty.” It instructed the guilt jury “not to be concerned in [its] deliberations with the matter of penalty or punishment.” At the end of the guilt phase, the court originally told the guilt jury that as to the noncapital counts, “the subject of penalty or punishment is not to be discussed or considered by you. That is a matter which must not in any way affect your verdict.” Later it corrected itself, and explained that the admonition applied to all the counts.
b. The Contentions
Penal Code section 190.4, subdivision (c), provides that normally the same jury should make both the guilt and the penalty determinations. (See People v. Beardslee (1991) 53 Cal.3d 68, 101 [279 Cal.Rptr. 276, 806 P.2d 1311].) Nevertheless, the court granted defendant’s motion to have separate juries. He now contends the court erred in allowing both juries to hear the guilt evidence. The Attorney General argues that he waived the contention by requesting separate guilt and penalty juries. Defendant has indeed waived any argument that the court erred in having separate juries, but his argument that the penalty jury had to be selected after the guilt verdict is preserved.
The argument, however, lacks merit. The court acted within its discretion when it allowed the penalty jury to hear the guilt evidence. The ruling made it unnecessary to repeat that evidence at the penalty trial and spared many witnesses the need to testify at both trials. “Whenever a courtroom arrangement is challenged as inherently prejudicial. . . , the question must be . . . whether ‘an unacceptable risk is presented of impermissible factors coming into play,’ [citation].” (Holbrook v. Flynn (1986) 475 U.S. 560, 570 [106 S.Ct. 1340, 1346, 89 L.Ed.2d 525] [allowing four uniformed state troopers to sit in the first row of the spectators’ section of the courtroom permissible].) We see no such unacceptable risk. Defendant argues the presence of the penalty jury “impermissibly predisposed the guilt-innocence jury toward conviction,” and the “guilt phase jury’s sense of responsibility was clearly *371 diminished.” On the contrary, the court explained the procedure and its purpose to the guilt jury and made clear that the trial would go to a penalty phase only if the guilt jury convicted defendant of capital charges. The procedure was not difficult to understand and would, we believe, seem quite reasonable to the guilt jurors. They knew it was their duty, and theirs alone, to determine guilt. We see no reason to believe they failed to fulfill that duty merely because a second jury was also in the courtroom.
Dr. Haney testified, “the presence of the penalty phase jury, in my opinion, is a clear and unmistakable message to the guilt phase jury that the defendant in the case is believed by the participants, the lawyers and the judge, to very likely be guilty.” Defendant argues he “was worse off, not better off, than a defendant tried at guilt phase by a death-qualified unitary jury.” To the extent defendant implies the court should not have allowed separate juries at all, he has waived the claim. Moreover, the fact that defendant did not request a unitary jury in the face of the court’s ruling undercuts his current claim that the ruling made him worse off. We also find Dr. Haney’s testimony unpersuasive. He had never studied actual jurors in this situation, who were “sworn under oath to apply the law to the facts of an actual case involving the fate of an actual capital defendant.” (Lockhart v. McCree (1986) 476 U.S. 162, 171 [106 S.Ct. 1758, 1764, 90 L.Ed.2d 137], fn. omitted.) We, like the United States Supreme Court, “have serious doubts about the value” of this testimony “in predicting the behavior of actual jurors.” (Ibid.)
Defendant also argues the court inadequately instructed the jury about the process and should have used the different language he proposed. We disagree. The actual instructions sufficiently explained the situation and eliminated any risk of prejudice. He also argues the court erred in selecting the penalty jury before the guilt jury. The court chose to select the penalty jury first because it correctly anticipated that process would take longer than selecting the guilt jury due to the individual questioning requirement of Hovey v. Superior Court, supra, 28 Cal.3d 1. Selecting the juries in this order minimized the time the chosen jurors had to wait before actually hearing evidence. The court acted sensibly. We see no abuse of discretion and no prejudice. There is no basis even to speculate the guilt jury based its verdict on the presence of the penalty jury rather than the evidence.[3]
*372 2. Requiring Defendant to Shave His Beard
Witnesses described the gunman who assaulted Hansen and Haertle as clean shaven. Defendant was wearing a beard when arrested several weeks later. The evidence showed he started growing it after the shooting. He continued to wear it during the preliminary hearing and the beginning of trial. Before the evidence portion of trial, the prosecution moved to compel defendant to shave the beard. The court granted the motion over objection. Because the jurors had seen defendant with a beard, the court explained to them that the beard was shaved due to a court order the prosecution requested.
Defendant contends that order violated his privilege against self-incrimination, the presumption of innocence, his right to a jury trial, and his constitutional right to “personal expression.” As the Attorney General notes, defendant did not raise most of these constitutional claims at trial, thus waiving them on appeal. (People v. Rowland (1992) 4 Cal.4th 238, 265, fn. 4 [14 Cal.Rptr.2d 377, 841 P.2d 897].) He did argue, however, that the order violated the presumption of innocence. He therefore preserved that claim.
The contentions also lack merit. The ruling did not violate the presumption of innocence. The prosecution still had to prove defendant was the gunman. Nor did it violate the right to a jury trial. The jury still had to determine defendant’s guilt. Under substantially identical facts, the Ninth Circuit rejected contentions that forcing the defendant to shave violated the Fifth Amendment privilege against self-incrimination and the First Amendment right of free speech and made the identification process unduly suggestive. (United States v. Valenzuela (9th Cir. 1983) 722 F.2d 1431, 1433-1434; see also Andrews v. State (1981) 291 Md. 622 [436 A.2d 1315, 24 A.L.R.4th 571] [upholding an order that the defendant not shave his beard].) Defendant relies primarily on the dissenting opinion in Andrews. (Andrews v. State, supra, at pp. 1324-1328 (dis. opn. of Eldridge, J.).) We find more persuasive the majority opinion in that case and the decision in Valenzuela. (United States v. Valenzuela, supra, 772 F.2d at pp. 1433-1434.)
The procedure was fair to both the prosecution and defense. It helped the witnesses compare defendant’s facial features with those of the gunman and thereby enhanced the reliability of their testimony. If shaving caused defendant to resemble the gunman, as some of the witnesses testified, that similarity was legitimate, probative evidence that he was the gunman. “[Requiring defendant to appear clean shaven and reveal his facial features . . . would *373 seem to reduce the chance of misidentification instead of increase it.” (United States v. Valenzuela, supra, 722 F.2d at p. 1434.) “ ‘[T]he First Amendment should not provide a criminal defendant with the right to possibly disguise himself at trial.’ ” (Ibid.)
3. The Court’s Response to the Personal Problems of the Defense Attorneys During Trial
a. Factual Background
During jury selection, Public Defender Lawrence P. Biggam and a deputy public defender (deputy) represented defendant. For a while, Biggam suffered from a chronic illness that occasionally either forced a continuance of jury selection or forced the deputy to appear alone on defendant’s behalf.
On Wednesday, March 28, 1984, Biggam, but not the deputy, appeared. Biggam said he was “fine,” and his illness had not affected his courtroom performance. He reported that the deputy’s young daughter had been kidnapped and sexually molested the previous day. The deputy was unable to come to court for the time being. The court expressed concern about a possible future conflict because the deputy might be “representing a man, who is being prosecuted by the same people that he is relying upon to apprehend and prosecute his daughter’s molester.” It stated it would declare a mistrial unless defendant waived any conflict. At Biggam’s request, it continued the case until the following Monday. Biggam stated he could “go solo next week without any problem.”
The next Monday, the district attorney reported that a suspect had been apprehended. Biggam stated that the deputy, his “partner and friend,” was “very distraught” and not yet certain whether he could continue to represent defendant. Neither Biggam nor the district attorney desired a mistrial after several months of jury selection. Biggam suggested that he finish picking the jury alone and that the taking of evidence commence on May 14, either with or without the deputy. The court took a 45-minute recess to allow Biggam to “talk to Mr. Carpenter, see what he says about things . . . .”
After the recess, the court explained the situation to defendant. The court said that it had originally thought it might be best to declare a mistrial “and start all over again,” but the attorneys for both sides wanted to continue the trial. The court also explained at length the possible conflict of interest that the deputy and the entire public defender’s office, including Biggam, faced as a result of the crime against the deputy’s daughter and the resultant prosecution of the suspect. The court “emphasize[d] that the decisions here *374 are entirely yours” and asked defendant if he needed more time to discuss the matter or to decide what he wanted to do. Defendant said he did not. The court then asked what defendant wanted to do. Defendant responded: “I would like to continue to select the jury today and get the jury selection out of the way. I would like to have the trial postponed until May 14, and I am perfectly willing to waive any so-called conflict of interest that could possibly arise.” Defendant stated he was willing to have Biggam finish selecting the jury alone. He also said he had confidence in every member of the public defender’s office, and that if the deputy could not continue, whoever Biggam chose to replace him would “be fine.”
Jury selection continued with Biggam representing defendant and concluded on April 5, 1984. The court scheduled the evidence part of trial to begin on May 14. On April 24, the court, Biggam, and the district attorney held a telephone conference call in which they decided that the deputy would not be able to continue representing defendant and that another deputy public defender, Stephen Wright, would replace him. On May 2, at a hearing held in defendant’s presence, the court announced that Wright “was seriously injured in an accident with a chain saw and is recuperating.” Wright still intended to try the case but would not be ready by May 14, and another delay was necessary. The court explained the circumstances to defendant. Defendant agreed to replace the deputy with Wright and to continue the case to May 21 for motions and May 23 for evidence. He did not “see any reason why we can’t go on the 21st.” Pointing out that Biggam had been with him for three years, defendant stated, “I say let’s go.” The case was continued as agreed. On May 21, defendant reiterated his consent to having Wright represent him.
The parties made opening statements on May 23, with Biggam and Wright representing defendant. They continued to represent him for the rest of the trial.
b. The Contentions
Defendant contends the court erred in several interrelated ways in responding to these events. We disagree. The court acted carefully and reasonably in protecting defendant’s rights while at the same time accommodating his wishes and those of his attorneys.
Defendant first contends the court erred in not appointing independent counsel to advise him concerning the conflict of interest. The question is moot as to the deputy, for he no longer represented defendant. We have doubts that the prosecution of the case involving the deputy’s daughter, by *375 itself, established a conflict of interest as to Biggam that would require reversal on appeal even if not waived. (See generally, People v. Jones (1991) 53 Cal.3d 1115, 1136-1137 [282 Cal.Rptr. 465, 811 P.2d 757].) But we need not resolve that question, for defendant personally waived any possible conflict after the court explained, carefully and in detail, the potential drawbacks of continued representation by possibly conflicted counsel. We have indicated the court must allow a defendant to discuss with outside counsel the potential drawbacks of representation by conflicted counsel if the defendant wishes (e.g., People v. Jones, supra, 53 Cal.3d at p. 1136), but that does not mean the court must appoint separate counsel every time a possible conflict arises.
Defendant relies on three cases decided after the trial of this case. None supports his position. In People v. Mroczko (1983) 35 Cal.3d 86 [197 Cal.Rptr. 52, 672 P.2d 835], one attorney represented two defendants jointly tried in a capital case. We found there was no knowing waiver of the conflict. We also adopted the rule that, “when the court undertakes to appoint counsel, it must initially select separate and independent counsel for each defendant . . . .” (Id. at p. 115.) This rule has no bearing on what a court should do when a possible conflict arises during a trial of a single defendant. In People v. Burrows (1990) 220 Cal.App.3d 116 [269 Cal.Rptr. 206] and Alcocer v. Superior Court (1988) 206 Cal.App.3d 951 [254 Cal.Rptr. 72], the appellate court found the trial court erred in prohibiting the defendant from being represented by seriously conflicted counsel despite the defendant’s desire to waive the conflict. Both decisions contain language that the court should appoint independent counsel to confer with the defendant regarding the conflict. (Burrows, supra, 220 Cal.App.3d at p. 123; Alcocer, supra, 206 Cal.App.3d at p. 961.) Although this advice may be good if the conflict is serious enough, neither case holds that a defendant can never make a valid waiver without first consulting independent counsel.
Courts need not appoint independent counsel every time a possible conflict arises. “A waiver need not be in any particular form, nor is it rendered inadequate simply because all conceivable ramifications are not explained.” (People v. Clark, supra, 3 Cal.4th at p. 140.) Defendant does not suggest what outside counsel could have told him that the court did not. The court had no reason to suspect additional facts had to be investigated. Defendant’s unequivocal statement that he had confidence in Biggam and the public defender’s office and wanted them to continue representing him despite any conflict was adequate. The court acted within its discretion without unduly interfering in the attorney-client relationship by making sure defendant knowingly waived any conflict.
Defendant also claims that allowing him to waive any conflict of interest violated Wheat v. United States (1988) 486 U.S. 153 [108 S.Ct. 1692, 100 *376 L.Ed.2d 140]. Wheat held that the trial court did not err in refusing to accept a waiver of conflict-free counsel. A holding that a court may refuse to accept a waiver does not mean the court must do so. Wheat might be relevant if the court had refused to allow defendant to waive any conflict and had forced him to accept new counsel. The court, however, acquiesced in defendant’s wishes.
Defendant next contends the court never obtained from him an “explicit waiver of a mistrial,” and his other express waivers were invalid. We disagree. Except for conflict-free counsel, defendant’s personal waiver was not required. When a defendant chooses to be represented by professional counsel, that counsel is “captain of the ship” and can make all but a few fundamental decisions for the defendant. (In re Horton (1991) 54 Cal.3d 82, 95 [284 Cal.Rptr. 305, 813 P.2d 1335] [counsel may stipulate to a capital trial before a court commissioner]; accord, People v. Freeman (1994) 8 Cal.4th 450, 485 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].) The court need not have obtained defendant’s personal consent. Counsel, not defendant, could properly decide whether one attorney alone could finish jury selection or whether to seek a mistrial or a continuance. Contrary to defendant’s argument, he had no right to have both counsel present in the courtroom at all times. (People v. Montiel (1993) 5 Cal.4th 877, 906, fn. 5 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) Moreover, defendant did consent to the actions that were taken. Although he did not expressly waive a mistrial, when the court explained it had wanted to grant a mistrial, he clearly stated he wished to continue the trial.
Finally, defendant contends that some of these hearings were held in chambers in his absence, violating his right to be present. Although the record is not always clear, it appears that defendant was absent from the hearings in chambers; we will assume he was. We have held, however, “that the defendant’s absence from various court proceedings, ‘even without waiver, may be declared nonprejudicial in situations where his presence does not bear a “reasonably substantial relation to the fullness of his opportunity to defend against the charge.” ’ ” (People v. Johnson (1993) 6 Cal.4th 1, 18 [23 Cal.Rptr.2d 593, 859 P.2d 673], italics added in Johnson.)
Defendant’s absence from some of the discussions in chambers did not substantially relate to his opportunity to defend against the charges. No issues related to guilt or innocence were considered. When defendant was present, the court explained to him the substance of what occurred. It kept him fully apprised of the significant events and obtained his consent to what would be done. Defendant’s claim that he was merely “presented with a fait accompli and asked whether he concurred in it” unfairly characterizes the *377 record. The court was always solicitous of defendant’s wishes. The decisions on which everyone, including defendant, agreed—completing the jury selection with Biggam alone, bringing in a new attorney, and continuing the trial to allow new counsel to prepare—were reasonable under the circumstances. Nothing in the record suggests that any of the defense attorneys acted other than fully competently at all times. We see no error and no prejudice. (See also People v. Hovey (1988) 44 Cal.3d 543, 573-574 [244 Cal.Rptr. 121, 749 P.2d 776] [no error in excluding defendant from a hearing on the competency of his attorney].)
4. Defendant’s Absence From Proceedings
During selection of the penalty jury, defense counsel asked that the court consider requests to be excused for hardship at the bench rather than in front of the other jurors. The court agreed if defendant waived his right to be present at the bench. When defense counsel was reluctant to have defendant do so, the court considered the first few requests for hardship excusal in open court. Defense counsel again stated he preferred to have them handled at the bench. The court yielded to this request after defendant personally waived his right to be present. Defendant argues his waiver was invalid because the court required it as a condition to granting his request that hardship questions be considered at the bench. We disagree. Defendant had no right to insist that hardship excuses be considered outside the presence of the other jurors. (People v. Kelly (1992) 1 Cal.4th 495, 518 & fn. 3 [3 Cal.Rptr.2d 677, 822 P.2d 385]; People v. Clark (1990) 50 Cal.3d 583, 596-597 [268 Cal.Rptr. 399, 789 P.2d 127].) The Hovey rule, which requires individual questioning while death-qualifying the jury, does not extend to other matters. (Hovey v. Superior Court, supra, 28 Cal.3d at p. 81, fn. 137.) It follows that defendant had no right to demand that the court question individual jurors at the bench and allow him to be present there, which would have created obvious logistical and security problems. Giving defendant a choice did not violate his rights. Moreover, defendant’s absence from the bench conferences regarding hardship was not prejudicial. (People v. Hardy (1992) 2 Cal.4th 86, 178 [5 Cal.Rptr.2d 796, 825 P.2d 781]; People v. Beardslee, supra, 53 Cal.3d at pp. 102-103; People v. Grant (1988) 45 Cal.3d 829, 845-846 [248 Cal.Rptr. 444, 755 P.2d 894].)
Before selecting the guilt jury, defense counsel suggested that, rather than sequestered questioning regarding the death penalty (see Hovey v. Superior Court, supra, 28 Cal.3d 1), the court explain the procedure of having two juries to the entire panel of prospective jurors and then ask if anyone could not sit on the case. The court agreed and stated it would ask necessary follow-up questions at the bench. Therefore, the court sometimes asked *378 prospective jurors at the bench about their views on the death penalty and other matters. Apparently, defendant was not present at the bench conferences, although he was in court. Defendant contends that his “presence would have insured that the prospective jurors would have appreciated the magnitude and implication of the questions they were being asked.” We disagree. Defendant was in the courtroom during the bench questioning, although apparently he was unable to hear it. The magnitude or implication of the questions was not diminished, and defendant suffered no prejudice. (People v. Hardy, supra, 2 Cal.4th at pp. 177-178.)
Before he testified, Shane Williams, the witness who led the police to the murder weapon, asked to speak to the judge. At the prosecution’s request, the court held an in camera hearing. Although defense counsel were present, the court denied their request that defendant be present. Williams expressed reluctance to testify because of concern about trial publicity. The court refused to issue an order limiting publicity and told Williams, “I don’t do favors and I don’t bargain and I don’t make deals.” Defendant contends that the hearing involved “the witness and the judge speaking on the record, under circumstances which might have a significant impact on what the witness would say when he testified before the jury.” On the contrary, the hearing had nothing to do with the substance of the witness’s testimony. Defendant was present at all times during the actual testimony. Moreover, defendant received daily transcripts of the proceedings. His presence at the brief proceeding bore no substantial relationship to his opportunity to defend against the charges. (People v. Johnson, supra, 6 Cal.4th at p. 18.)
5. Evidence of Uncharged Crimes
Over objection, the court admitted evidence of three murders and one rape that defendant committed in Marin County in October and November 1980 that were not charged in this case. (They were charged in another case—see ante, fn. 1.) It found the evidence probative on the questions of intent, deliberation, and premeditation as to the shooting of Haertle, Hansen, and Scaggs, and the question of intent to rape Hansen. The court expressly found the probative value of the evidence outweighed its prejudicial effect. Defendant contends the court erred in admitting the evidence and in instructing the jury how to consider it.
a. Admission of Evidence
The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring *379 exclusion of the evidence. (People v. Thompson (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883].) The facts of intent to kill, premeditation and deliberation, and intent to rape were certainly material. Defendant’s not guilty plea put in issue all of the elements of the offenses, including intent. (People v. Daniels (1991) 52 Cal.3d 815, 857-858 [277 Cal.Rptr. 122, 802 P.2d 906].)
The Marin County crimes also had a strong tendency to prove these facts. Ballistics evidence established that the same gun was used to shoot each victim; hence, almost certainly the same person committed each crime. Each victim was shot in the head at close range in a remote hiking area. The similarities among the crimes easily meet the standard needed to show intent. “The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.” (People v. Ewoldt (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) “In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ‘ “probably harbor[ed] the same intent in each instance.” [Citations.]’ (People v. Robbins [(1988)] 45 Cal.3d 867, 879 [248 Cal.Rptr. 172, 755 P.2d 355].)” (Ibid.)
“The reasoning underlying use of an actor’s prior acts as circumstantial evidence of that actor’s later intent is well explained by Wigmore. It is based on ‘the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them. [^Q ... In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act; and the force of each additional instance will vary in each kind of offense according to the probability that the act could be repeated, within a limited time under given circumstances, with an innocent intent.’ (2 Wigmore, Evidence (Chadbourn rev. 1979) § 302, at p. 241; see also Wydick, Character Evidence: A Guided Tour of the Grotesque Structure (1987) 21 U.C. Davis L.Rev. 123, 166-169; Imwinkelried, [Uncharged Misconduct Evidence (1984)] § 4:01.)” (People v. Robbins (1988) 45 Cal.3d 867, 879-880 [248 Cal.Rptr. 172, 755 P.2d 355].)
*380 A jury could reasonably infer from the evidence that defendant shot and killed three persons in 1980, that he intended to kill when he shot and killed two others, and shot but only wounded a third, several months later. Similarly, a jury could reasonably infer from the evidence that he raped one of the Marin County victims that he later intended to carry out his threat to rape Hansen.
There is also no rule or policy requiring exclusion. Evidence of uncharged crimes is inherently prejudicial but may still be admitted if it has substantial probative effect. (People v. Ewoldt, supra, 7 Cal.4th at p. 404.) The matter lies within the discretion of the trial court. (Id. at p. 405; People v. Robbins, supra, 45 Cal.3d at p. 880.) The ruling here was well within the court’s discretion. The evidence was highly probative on the issues for which it was admitted. The circumstances of this case minimized its prejudicial effect. Because of the similarity of the crimes and especially the evidence that the same gun was used each time, evidence that defendant committed the crimes in this case tended to establish that he committed the Marin County crimes. As the trial court recognized, however, the reverse was not true. Little independent evidence was presented that defendant committed the Marin County crimes. Thus, only if the jury found defendant committed the crimes in this case would it find he committed the Marin County crimes. There was no danger the jury might doubt that he committed the charged offenses but convict anyway because of a belief he committed the uncharged crimes. (See People v. Ewoldt, supra, 7 Cal.4th at p. 405.) “[Cjlearly if the defendant cannot be connected to the prior act, admission of evidence concerning it will not normally prejudice him.” (People v. Simon (1986) 184 Cal.App.3d 125, 130, fn. 3 [228 Cal.Rptr. 855].) The court properly found that the probative value of the evidence on intent and premeditation outweighed the potential for prejudice. (People v. Robbins, supra, 45 Cal.3d at p. 881.)[4]
b. Instructions
The court instructed the jury to consider the Marin County crimes only if it found defendant committed them “by a preponderance of the evidence.” Defendant contends the court should have required “clear and convincing proof.” The issue has little practical significance here. The evidence that defendant was the Santa Cruz County gunman was so overwhelming that the defense conceded it to the jury. The evidence that the *381 same gun was used in the Marin County crimes was at least clear and convincing proof he also committed those crimes. Nevertheless, we address the question. The Attorney General argues, first, the issue is not cognizable because at trial defendant asked the court to adopt a reasonable doubt standard. We disagree. The instruction affected the “substantial rights of the defendant.” (Pen. Code, § 1259.) The contention, however, lacks merit.
Our pronouncements on the question have not been entirely consistent. In 1969, we stated, “It is settled law that during the guilt trial evidence of other crimes may be proved by a preponderance of the evidence . . . .” (People v. McClellan (1969) 71 Cal.2d 793, 804 [80 Cal.Rptr. 31, 457 P.2d 871] [contrasting this rule with the reasonable doubt standard applicable at the penalty phase].) Several then recent decisions supported the statement. (People v. Durham (1969) 70 Cal.2d 171, 187, fn. 15 [74 Cal.Rptr. 262, 449 P.2d 198]; People v. Cavanaugh (1968) 69 Cal.2d 262, 273-274, fn. 9 [70 Cal.Rptr. 438, 444 P.2d 110]; People v. Haston (1968) 69 Cal.2d 233, 253 [70 Cal.Rptr. 419, 444 P.2d 91]; People v. Polk (1965) 63 Cal.2d 443, 451 [47 Cal.Rptr. 1, 406 P.2d 641].) In People v. Medina, supra, 11 Cal.4th at pages 762-764, we reiterated the preponderance standard against an argument that the reasonable doubt standard should apply, although the defendant did not specifically urge the clear and convincing evidence standard. None of these decisions considered that two previous decisions, one from this court, appeared to read the plurality opinion in People v. Albertson (1944) 23 Cal.2d 550, 577 [145 P.2d 7], as requiring clear and convincing evidence. (People v. Wade (1959) 53 Cal.2d 322, 330 [1 Cal.Rptr. 683, 348 P.2d 116]; People v. Rosenfield (1966) 243 Cal.App.2d 60, 68 [52 Cal.Rptr. 101].)
Only a year after we decided McClellan, the clear and convincing standard arguably reappeared. In People v. Terry (1970) 2 Cal.3d 362, 396 [85 Cal.Rptr. 409, 466 P.2d 961], we said, “Juanelda [one of the appellants] also argues that even if the proof of the Alamo robbery was relevant, it was inadmissible because there was no clear and convincing proof connecting her with the crime. (People v. Wade, 53 Cal.2d 322, 330 [1 Cal.Rptr. 683, 348 P.2d 116]; People v. Rosenfield, 243 Cal.App.2d 60, 68 [52 Cal.Rptr. 101].) There was such evidence.” Defendant argues that this language impliedly overruled the decisions establishing the preponderance standard in favor of the earlier ones stating the clear and convincing standard. However, our describing and then rejecting a defense argument that the evidence was inadmissible because it was not clear and convincing did not necessarily establish the applicable standard. We may merely have not felt obligated to discuss the correct standard. We certainly did not clearly overrule what we had so recently said was settled law. More recently, we have cited with *382 approval decisions stating the preponderance standard and ignored the cases, including Terry, suggesting a different standard. (People v. Medina, supra, 11 Cal.4th at p. 763; People v. Robertson (1982) 33 Cal.3d 21, 53 [188 Cal.Rptr. 77, 655 P.2d 279]; People v. Tewksbury (1976) 15 Cal.3d 953, 965, fn. 12 [127 Cal.Rptr. 135, 544 P.2d 1335].)
The United States Supreme Court, interpreting the Federal Rules of Evidence, has adopted the preponderance standard. (Huddleston v. United States (1988) 485 U.S. 681, 687, fn. 5, 690 [108 S.Ct. 1496, 1500, 99 L.Ed.2d 771]; Bourjaily v. United States (1987) 483 U.S. 171, 176 [107 S.Ct. 2775, 2779, 97 L.Ed.2d 144]; see also Dowling v. United States (1990) 493 U.S. 342, 348 [110 S.Ct. 668, 672, 107 L.Ed.2d 708].) Court of Appeal decisions postdating Terry have applied the preponderance standard. (People v. Simon, supra, 184 Cal.App.3d at pp. 132-134 [noting the inconsistent history of the rule]; People v. Harris (1977) 71 Cal.App.3d 959, 965-966 [139 Cal.Rptr. 778]; People v. Donnell (1975) 52 Cal.App.3d 762, 777 [125 Cal.Rptr. 310].)
In light of this authority, we adhere to the preponderance standard and disapprove any language suggesting the clear and convincing evidence standard. The preponderance of the evidence standard adequately protects defendants. Once the other crimes evidence is admitted, whatever improper prejudicial effect there may be is realized whatever standard is adopted. If the jury finds by a preponderance of the evidence that defendant committed the other crimes, the evidence is clearly relevant and may therefore be considered. (Evid. Code, § 351; see Huddleston v. United States, supra, 485 U.S. at p. 689 [108 S.Ct. at p. 1501].) The preponderance standard is also consistent with the rule stated in Evidence Code section 115 that “Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence.”
When the evidence of the Marin County crimes was presented, the court instructed the jury to consider it “solely on the matter of the state of mind involved in the commission of the offenses” and not as “evidence of the defendant’s character or as any evidence that he is inclined to commit crimes.” The court repeated the substance of the instruction at the end of the guilt phase. Defendant contends the court erroneously “did not require the jury to find the necessary foundational facts” that he “acted with an intent to rape and a premeditated and deliberate intent to kill, and that the Santa Cruz crimes were so similar in nature to the Marin crimes that if [defendant] had a specific intent and mental state in the latter, he also had that intent and mental state in the former.” No additional instructions, however, were needed.
*383 Once the court admitted evidence of the Marin County crimes on the question of intent, the only foundational requirement was the obvious one that defendant committed them. As explained above, the more often defendant killed or raped, the more likely he (1) intended (and premeditated) the result actually achieved, (2) intended to fulfill his statement of intent to rape Hansen, and (3) intended to kill Haertle although Haertle survived. Stated differently, evidence that defendant killed and raped before he shot Hansen and Haertle reduced the likelihood that the shooting was accidental or he did not intend to kill or rape. (People v. Robbins, supra, 45 Cal.3d at pp. 879-880.) This simple logic required no complex instructions. Defendant relies on People v. Simon, supra, 184 Cal.App.3d at pages 131-132, which found the court erred in not giving additional limiting instructions. Simon, however, involved a prior nonfatal assault, not, as here, actual killings. Whatever merit there may be to the Simon court’s holding under those facts, it has no relevance here.
Defendant also contends that the combined instructions reduced the prosecution’s burden of proof as to his mental state below that of reasonable doubt. As noted, the court instructed the jury it could consider the Marin County crimes if it found by a preponderance of the evidence he committed those crimes. The court also gave the standard instruction regarding the general sufficiency of circumstantial evidence to prove guilt, but, because of the direct eyewitness evidence as to the Haertle-Hansen crimes, limited that instruction to the counts involving Scaggs. Defendant argues the evidence of intent as to all crimes was circumstantial. Therefore, he claims, the jury might infer from these instructions that the prosecution need prove intent only by a preponderance of the evidence. However, the court also gave the standard instructions on reasonable doubt in general and on the sufficiency of circumstantial evidence to prove the necessary “specific intent or mental state.” These instructions made clear the reasonable doubt standard applies to intent as well as identity. No error appears.
6. Defendant’s Statement to the Police
Defendant contends the court erred in denying his motion to exclude the statements he made on May 8, 1981, to police officers investigating Scaggs’s disappearance. He claims he was in custody, and the officers should have given him his Miranda warnings. (Miranda v. Arizona (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].)
San Jose Police Officers Robinson and Womack testified that on the afternoon of May 8, they arranged with defendant’s parole officer to meet defendant and the parole officer at the latter’s office in San Francisco. The *384 officers knew that defendant had been scheduled to go to Santa Cruz with Scaggs the day she disappeared. They introduced themselves to defendant and said they were investigating Scaggs’s disappearance. They told defendant that “at no time was he ever under arrest or in custody, or did we consider it so,” and that “anytime he wished to terminate the interview, he was free to do so.” They “made it clear that his showing up there was totally voluntary.” They said they had requested the meeting and would like to talk to him, “but that he was certainly under no obligation to talk to us, that we came to him in a neutral location so that he would feel comfortable talking to us, but that he could choose not to if he didn’t wish to . . . .” Defendant told the officers “that he was comfortable with being here, and that he was as concerned as the police were that [Scaggs] was missing, and wanted to do anything he could to help in that regard.” He said “he would be more than happy to talk with” the officers. At one point, defendant said he did not want to talk about a certain topic, and they did not. “At no time did [defendant] ever indicate that he wished to terminate the interview, and as a matter of fact, the more we talked, the more talkative [defendant] became, and finally we terminated the interview because of time.” The interview lasted about two hours, and then defendant left. The court admitted the statements, finding that defendant was not in custody, and that “[i]t was nothing more than a police interview of a person who knew a young woman who was missing for six days.”
“An officer’s obligation to administer Miranda warnings attaches . . . ‘only where there has been such a restriction on a person’s freedom as to render him “in custody.’”” (Stansbury v. California (1994) 511 U.S. 318, 322 [114 S.Ct. 1526, 1528, 128 L.Ed.2d 293].) In this case, whether we review the trial court’s finding independently or deferentially (see People v. Stansbury (1995) 9 Cal.4th 824, 830-831 [38 Cal.Rptr.2d 394, 889 P.2d 588]), defendant was not in custody. There were, indeed, virtually no indicia of custody. The officers expressly told defendant he was not in custody and was free to leave at any time. Defendant argues that the officers suspected he had murdered Scaggs and had committed some of the other crimes. To the extent they did, their suspicions, undisclosed to defendant, do not establish custody. “[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.” (Stansbury v. California, supra, 511 U.S. at p. 323 [114 S.Ct. at p. 1529].) “It is well settled, then, that a police officer’s subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda” (Id. at p. 324 [114 S.Ct. at pp. 1529-1530].)
*385 7. Admission of Photographs
Over defense objection under Evidence Code section 352, the court admitted photographs of Scaggs’s body. Although finding two of the photographs “gruesome in the extreme,” it admitted them, in its “discretion,” on the issues of “the time of death and the place of death and the place where the body was left.” It also admitted two other photographs of the body that it found less gruesome. The court also admitted photographs of the bodies of Alderson, Moreland, and Stowers over objection. It excluded a photograph of Hansen’s body “under [Evidence Code section] 352, as being unnecessarily gruesome.”
Defendant contends the court erred in admitting the photographs and violated his federal constitutional rights. Because defendant objected only on statutory grounds, the constitutional arguments are not cognizable on appeal. (People v. Raley (1992) 2 Cal.4th 870, 892 [8 Cal.Rptr.2d 678, 830 P.2d 712].) Moreover, the court did not err. The photographs of Scaggs were relevant for the purposes the court found. Defendant complains the photographs were especially gruesome because of the ravages of wild animals during the three weeks before the body was found. However, the jury was informed that wild animals, not defendant, did much of the damage. Moreover, “ ‘murder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant. . . .’ ” (People v. Pierce (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91].) The photographs of the Marin County victims were also relevant to show the similarity to the charged crimes, and to the mental states of intent to kill and premeditation. The court did not abuse its broad discretion in admitting the photographs. (People v. Crittenden, supra, 9 Cal.4th at pp. 133-134; People v. Clair (1992) 2 Cal.4th 629, 660 [7 Cal.Rptr.2d 564, 828 P.2d 705].)
Defendant also contends the court erred in admitting a photograph of Scaggs while alive. The issue is not cognizable because he did not object at trial. (People v. Raley, supra, 2 Cal.4th at p. 892.) If relevant, the court has discretion to admit photographs of victims while alive. (People v. Zapien (1993) 4 Cal.4th 929, 983 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Because defendant failed to object, we cannot meaningfully judge the question. In any event, given the facts of the case, admitting any of the photographs was certainly not prejudicial.
8. Admission of Videotape
Over objection, the court admitted a silent 15-minute videotape depicting 13 scenes relating to the Hansen/Haertle shooting. It was filmed on *386 two separate visits to the crime scene. The prosecution sought its admission to “illustrate” Haertle’s testimony. The court viewed the videotape and said it contained “absolutely nothing sensational or apt to raise passions at all . . . .” Haertle testified he directed the taping, and the tape accurately depicted the scene as it appeared on the day of the shooting. He narrated the tape as it was shown in court.
Defendant contends the court erred. “In ruling upon the admissibility of a videotape, a trial court must determine whether: (1) the videotape is a reasonable representation of that which it is alleged to portray; and (2) the use of the videotape would assist the jurors in their determination of the facts of the case or serve to mislead them. [Citation.] Within these limits, ‘ “the physical conditions which existed at the time the event in question occurred need not be duplicated with precision nor is it required that no change has occurred between the happening of the event and the time the [videotape] is taken. [Citation.]” ’ [Citation.]” (People v. Rodrigues, supra, 8 Cal.4th at p. 1114.) Defendant claims the tape lacked sufficient foundation. Haertle’s testimony that it accurately depicted the crime scene, however, provided the foundation. Defendant also complains it was “seriously misleading,” primarily because some of the scenes lasted longer than the actual events and the camera, which was generally stationary, did not move along the trail as Haertle had.
Differences between real life and a videotape are inevitable and readily apparent to the jury. The videotape illustrated Haertle’s testimony; it did not replace it. Defendant cites People v. Sims (1993) 5 Cal.4th 405, 452 [20 Cal.Rptr.2d 537, 853 P.2d 992], where we upheld the admission of a videotape, but cautioned “that in other circumstances, a videotape may present a far more graphic, gruesome, and potentially prejudicial depiction than static photographs and thus, under such circumstances, should be excluded from evidence.” However, defendant does not claim the videotape was graphic or gruesome. The court acted within its discretion in admitting it. (Ibid.)
Defendant also contends the prosecution violated the court’s discovery order because it did not give the videotape to the defense until “many months after the final discovery deadline.” The tape was not filmed, however, until long after that deadline. The prosecution need not provide discovery of evidence before it exists. It provided the tape to the defense a reasonable time after it was filmed. Moreover, defendant did not request a continuance of trial. “It is defendant’s burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm.” (People v. Pinholster, supra, 1 Cal.4th *387 at p. 941.) He does not meet this burden. In addition, contrary to defendant’s contention, there is no requirement the prosecution prepare written reports about the videotaping sessions. (See People v. Fauber, supra, 2 Cal.4th at pp. 828-830.)
9. Sufficiency of the Evidence of Attempted Rape
Defendant contends the evidence was insufficient to support the conviction of attempted rape of Hansen and the accompanying felony-murder instructions and rape-murder special circumstance. “To determine sufficiency of the evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. In this process we must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole.” (People v. Johnson, supra, 6 Cal.4th at p. 38.)
Defendant argues attempted rape requires “some physical conduct of a distinctly and unambiguously sexual nature” and implies a defendant must physically touch the victim. He merely cites a few cases involving this touching. The occurrence of physical touching in some cases, however, does not make it required in all. An attempt to commit a crime has two elements: the intent to commit the crime and a direct ineffectual act done toward its commission. The act must not be mere preparation but must be a direct movement after the preparation that would have accomplished the crime if not frustrated by extraneous circumstances. (People v. Memro (1985) 38 Cal.3d 658, 698 [214 Cal.Rptr. 832, 700 P.2d 446].) Defendant’s statement, “I want to rape you,” clearly established his intent, which was also indicated by evidence that on two other occasions, one earlier and one later, he did in fact rape. Defendant’s acts of pointing his handgun at Hansen and ordering her to do what he said went beyond mere preparation and constituted direct acts toward the commission of the crime. Ample evidence supported the verdict.
Defendant also argues the rape-murder special circumstance must be set aside because the attempted rape was merely incidental to the murder. However, the jury, correctly instructed, reasonably found otherwise. The evidence that defendant said he wanted to rape Hansen strongly suggests that his primary motivation was rape, not murder, or at least that the rape was an “independent purpose.” (People v. Wright, supra, 52 Cal.3d at pp. 416-417.) Defendant also argues the rape-murder special circumstance is inconsistent *388 with the lying-in-wait special circumstance because the former requires an “after-formed intent to kill,” while the latter requires a “pre-existing intent to kill.” He is incorrect. The rape-murder special circumstance requires that the rape not be merely incidental to the murder but does not require that the intent to kill arise after the rape or attempt to rape. The requirements for lying in wait are discussed below, but it is sufficient to point out here that if, as the jury reasonably could have found, defendant lay in wait intending to rape and then to kill, both lying-in-wait and rape-murder special circumstances would be established.
10. Lying in Wait
The court instructed the jury on lying in wait as a theory of first degree murder and as a special circumstance regarding the charge of murdering Hansen. Defendant contends the evidence was insufficient to support either instruction and the instructions, even if factually supported, misstated the law.
a. Sufficiency of the Evidence
The requirements of lying in wait for first degree murder under Penal Code section 189 are “slightly different” from the lying-in-wait special circumstance under Penal Code section 190.2, subdivision (a)(15). (People v. Ceja (1993) 4 Cal.4th 1134, 1140, fn. 2 [17 Cal.Rptr.2d 375, 847 P.2d 55].) Defendant challenges the sufficiency of the evidence as to both. We focus on the special circumstance because it contains the more stringent requirements. (Ibid.) If, as we find, the evidence supports the special circumstance, it necessarily supports the theory of first degree murder.
The lying-in-wait special circumstance requires “an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .” (People v. Morales (1989) 48 Cal.3d 527, 557 [257 Cal.Rptr. 64, 770 P.2d 244]; see People v. Sims, supra, 5 Cal.4th at p. 432.) “The element of concealment is satisfied by a showing ‘ “that a defendant’s true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.” ’ ” (People v. Sims, supra, 5 Cal.4th at pp. 432-433.) Viewing the evidence, as we must, in the light most favorable to the judgment, we find the evidence sufficient to support each of these elements.
The evidence supported a finding that defendant first passed Hansen and Haertle on the trail without speaking. Defendant then went to the observation *389 deck and peered at the trail with binoculars before returning for the fatal encounter. He appeared suddenly to the unsuspecting victims at an isolated location where they were completely vulnerable. When Haertle first saw him, defendant was about 15 to 30 feet away and “walking out around the comer.” The parties debate exactly what the phrase “around the comer” means in light of all the evidence. We need not examine the precise fashion in which defendant first confronted Haertle because, however that is interpreted, a jury could reasonably infer that defendant concealed his purpose, waited and watched for an opportune time to act, and then, when his victims reached an isolated spot where no help could be expected, made a surprise attack from a position of advantage.
Defendant argues the evidence shows only an intent to rape, not to kill, at the time of the lying in wait. We disagree. Although defendant no doubt did intend to rape, the two intents are not mutually exclusive. Based on defendant’s subsequent actions in killing Hansen almost immediately, and the other occasions in which he both raped and killed, the jury could reasonably find that at the moment of the attack, defendant had a dual intent: to rape first, then kill. Defendant also argues he made no surprise attack because he was 15 to 30 feet from Haertle when he first appeared, and they had a brief conversation before he started shooting. “The brief interval of time” between his first appearance and the shooting did not negate a surprise attack. (People v. Edelbacher (1989) 47 Cal.3d 983, 1021 [254 Cal.Rptr. 586, 766 P.2d 1] (lead opn. of Kaufman, J.).) The jury could reasonably find “no lapse in the culpable state of mind between the homicide and the period of watchful waiting.” (People v. Berberena (1989) 209 Cal.App.3d 1099, 1107 [257 Cal.Rptr. 672].) Defendant also argues he did not kill “while” lying in wait because he first attempted to rape Hansen. (Pen. Code, § 190.2, subd. (a)(15).) However, if a person lies in wait intending first to rape and second to kill, then immediately proceeds to carry out that intent (or attempts to rape, then kills), the elements of the lying-in-wait special circumstance are met. There was no lapse in the culpable mental state of the defendant, and “the shooting occurred without any ‘cognizable interruption’ following the lying in wait under any legal standard. (Cf. Domino v. Superior Court (1982) 129 Cal.App.3d 1000, 1011 [181 Cal.Rptr. 486], with People v. Morales, supra, 48 Cal.3d at p. 558.)” (People v. Edwards, supra, 54 Cal.3d at p. 826.)
b. The Instructions
The court’s instructions on lying-in-wait murder were identical to instructions we have repeatedly upheld except for two sentences added at defense request. (People v. Ceja, supra, 4 Cal.4th at pp. 1139-1140; People v. Ruiz (1988) 44 Cal.3d 589, 613-614 & fn. 3 [244 Cal.Rptr. 200, 749 P.2d *390 854].) Defendant contends the court erred in refusing two other instructions he requested. One, however, erroneously implied defendant must have been physically concealed. Both otherwise duplicated the instructions actually given. The court need not give duplicative or erroneous instructions. (People v. Mickey, supra, 54 Cal.3d at p. 697.)
Defendant also argues that the second of the two sentences the court added at his request was itself error: “If you find that defendant merely intended to rape during a period of watchful waiting and concealment, then you may not find the lying in wait special circumstance to be true.” This instruction accurately states the law but was given as part of the instructions on first degree murder, not on the special circumstance. Defendant contends that, by referring solely to the special circumstance, the instruction contains “an erroneous negative implication” that for first degree murder, a mere intent to rape is sufficient. The Attorney General responds, first, that any error was invited. (See generally, People v. Cain, supra, 10 Cal.4th at p. 38, fn. 14.) We disagree. Although defendant did request the instruction, the record does not reflect that he wanted it with the first degree murder instructions rather than the special circumstance instructions. The contention, however, lacks merit. The court made clear that more than an intent to rape was necessary for lying-in-wait murder. The instructions were inconsistent regarding exactly what that intent requirement was. The court correctly gave the standard instruction that, for lying-in-wait murder, the defendant must intend to inflict “ ‘bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life.’ ” (People v. Ruiz, supra, 44 Cal.3d at p. 614, fn. 3; see also People v. Ceja, supra, 4 Cal.4th at p. 1140, fn. 2; People v. Webster (1991) 54 Cal.3d 411, 448 [285 Cal.Rptr. 31, 814 P.2d 1273].) At defense request, the court also stated that defendant must have “intended to kill.” Defendant cannot complain of this additional language, as it is favorable to him, and the invited error doctrine clearly applies. (People v. Cain, supra, 10 Cal.4th at p. 38, fn. 14.) Moreover, any error was harmless. The jury found the special circumstance true, showing that it did not find a mere intent to rape but also to kill.
The instructions on the lying-in-wait special circumstance were also identical to instructions we have repeatedly upheld. (People v. Sims, supra, 5 Cal.4th at pp. 433-434; People v. Edwards, supra, 54 Cal.3d at p. 845 & fn. 16.) Defendant challenges the language stating that the duration of the lying in wait must be “such as to show a state of mind equivalent to premeditation or deliberation.” (Italics added.) We have upheld this language both for lying-in-wait murder (People v. Stanley (1995) 10 Cal.4th 764, 794 [42 Cal.Rptr.2d 543, 897 P.2d 481]; People v. Ruiz, supra, 44 Cal.3d at pp. 614-615) and the special circumstance (People v. Sims, supra, 5 Cal.4th at p. *391 434; People v. Hardy, supra, 2 Cal.4th at pp. 162-163, 191; People v. Edwards, supra, 54 Cal.3d at p. 845), and we continue to do so.
11. Instructions on Attempted Murder
Defendant contends the court erroneously allowed the jury to find him guilty of attempting to murder Haertle on an implied malice theory. We agree that attempted murder requires express malice, i.e., an intent to kill (People v. Collie (1981) 30 Cal.3d 43, 61-62 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776]), but disagree that the court misinstructed. Defendant correctly points out that in instructing on attempted murder, the court referred to the elements of murder, which included implied malice, and said that those “elements apply when the crime is attempted.” However, the court also instructed that an attempt requires “a specific intent to commit the crime” and that the “crime of attempted murder requires the specific intent to commit murder.” “[I]t is impossible to intend to commit a murder without intending to kill.” (People v. Coleman (1989) 48 Cal.3d 112, 139 [255 Cal.Rptr. 813, 768 P.2d 32]; see also People v. Avena, supra, 13 Cal.4th at pp. 416-417.) Contrary to defendant’s claim, the district attorney also correctly noted that “attempted murder would require the intent to unlawfully kill another human being, the intent required for murder.”
12. Instructions on Rape
Defendant contends the court should have instructed that rape requires “that non-consensual intercourse occurred prior to death . . . .” We agree that this is the law. “A dead body cannot be raped.” (People v. Kelly, supra, 1 Cal.4th at p. 526.) But the instructions adequately conveyed this law. The court instructed that rape requires intercourse “against the will” of the victim “accomplished by means of fear of immediate and unlawful bodily injury to such person.” It is not reasonably likely the jury would misconstrue these instructions as allowing rape of a dead body. (People v. Kelly, supra, 1 Cal.4th at p. 525.) A dead body can neither have a “will” nor “fear . . . bodily injury.” The instructions were different in the cases defendant cites. (People v. Sellers (1988) 203 Cal.App.3d 1042, 1050 [250 Cal.Rptr. 345] [defense theory was that intercourse occurred after death, and the “trial court ruled, as a matter of law, it was irrelevant whether sexual penetration took place before or after the victim was dead”]; People v. Kelly, supra, 1 Cal.4th at p. 526 [trial court instructed, “ ‘It is legally possible to rape a dead body’ ”].) “If defendant believed that the instruction was incomplete or needed elaboration, it was his responsibility to request an additional or clarifying instruction.” (People v. Bell (1989) 49 Cal.3d 502, 550 [262 *392 Cal.Rptr. 1, 778 P.2d 129]; see also People v. Alvarez (1996) 14 Cal.4th 155, 244 [58 Cal.Rptr.2d 385, 926 P.2d 365].) He made no such request, undoubtedly because the standard instructions were clear enough, and the defense theory of the case was not that defendant killed Scaggs and then had intercourse, but that he did not have intercourse.
13. Instructions on Defendant’s Out-of-court Statements
The court refused the prosecution request to instruct (1) that the jury must view evidence of defendant’s oral admissions or confession “with caution” (the cautionary instruction), and (2) that the corpus delicti of a crime must be proved independently of defendant’s admission or confession (the corpus delicti instruction). Defendant contends the court erred. He focuses on two items of evidence: (1) Haertle’s testimony that defendant looked at Hansen and said, “ T want to rape you’ ”; and (2) evidence that defendant told the police investigating Scaggs’s disappearance, “ T just pray that nobody finds Heather’s body, or that in fact she has been raped.’ ” We conclude the court should have given the cautionary, but not the corpus delicti, instruction. The error was harmless.
a. Cautionary Instruction
When the evidence warrants, the court must give the cautionary instruction sua sponte. (People v. Lang (1989) 49 Cal.3d 991, 1021 [264 Cal.Rptr. 386, 782 P.2d 627]; People v. Beagle (1972) 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1].) Defendant’s statement of intent to rape Hansen was part of the crime itself. The initial question is whether it is the sort of statement that requires the cautionary instruction. In Beagle, we found the court erred in failing to give sua sponte either the cautionary or the corpus delicti instruction. (People v. Beagle, supra, 6 Cal.3d at p. 455.) We explained: “For purposes of requiring independent evidence of the corpus delicti and cautionary instructions, we have not distinguished between actual admissions [citation] and pre-offense statements of intent [citation]. [Citations.]” (Id. at p. 455, fn. 5.) We stated that although the risk of conviction because of a false preoffense statement alone is less than the risk of conviction upon a false confession or admission, “we find the risk of an unjust result sufficient to justify our broader rule.” (Ibid.)
One of the cases we cited in Beagle was People v. Ford (1964) 60 Cal.2d 772, 780-784, 799 [36 Cal.Rptr. 620, 388 P.2d 892], where we found the court should have given the cautionary instruction regarding evidence of defendant’s statements during the entire course of the events surrounding the crime, including some just before and some just after the fatal shooting. The *393 rationale behind the cautionary instruction suggests it applies broadly. “The purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made.” (People v. Beagle, supra, 6 Cal.3d at p. 456.) This purpose would apply to any oral statement of the defendant, whether made before, during, or after the crime. Therefore, the court should have given the cautionary instruction at least as to defendant’s statement to Hansen.
We apply the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given. (People v. Stankewitz (1990) 51 Cal.3d 72, 94 [270 Cal.Rptr. 817, 793 P.2d 23]; People v. Beagle, supra, 6 Cal.3d at p. 456.) Defendant argues a violation of state law also violates federal due process, thus mandating the more stringent standard for federal constitutional error. He is wrong. Mere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution. (Estelle v. McGuire (1991) 502 U.S. 62, 71-75 [112 S.Ct. 475, 481-484, 116 L.Ed.2d 385].) Failure to give the cautionary instruction is not one of the “ ‘very narrow[]’ ” categories of error that make the trial fundamentally unfair. (Id. at p. 73 [112 S.Ct. at p. 482].)
Under this standard, the error was harmless. Haertle’s testimony was uncontradicted. The statement he testified defendant made consisted of five simple words, spoken when defendant had Haertle’s full attention. There was “no evidence that the statement was not made, was fabricated, or was inaccurately remembered or reported.” (People v. Stankewitz, supra, 51 Cal.3d at p. 94.) Moreover, the court fully instructed the jury on judging the credibility of a witness, thus providing guidance on how to determine whether to credit the testimony. Accordingly, there is no reasonable probability the error was prejudicial; indeed, we would even find the error harmless beyond a reasonable doubt.
The same applies to defendant’s statement to the police even assuming, contrary to the trial court’s finding, that it was an admission. The defense did not express concern at the court’s ruling. As the cautionary instruction would have defined an “admission,” the defense may have preferred it not be given. This circumstance does not obviate the court’s sua sponte duty, but may be considered in determining prejudice. Moreover, the evidence was uncontradicted. Defendant made the statement to two police officers who were, no doubt, carefully listening for any possibly incriminating remarks. The statement was also insignificant relative to the other evidence.
b. Corpus Delicti Instruction
Defendant argues the court had to give the corpus delicti instruction regarding the evidence that he told Hansen he wanted to rape her. We *394 disagree. We have extended the corpus delicti rule to preoffense statements of later intent as well as to postoffense admissions and confessions (People v. Beagle, supra, 6 Cal.3d at p. 455), but not to a statement that is part of the crime itself (Cf. People v. Ford, supra, 60 Cal.2d at pp. 799-800 [involving the cautionary instruction but not the corpus delicti instruction].) A statement to the victim of current intent can itself supply the corpus delicti. Unlike the cautionary instruction, the corpus delicti rule is designed to provide independent evidence that the crime occurred, not to help determine whether the statement was made. Its principle reason is to ensure “that the accused is not admitting to a crime that never occurred.” (People v. Jennings (1991) 53 Cal.3d 334, 368 [279 Cal.Rptr. 780, 807 P.2d 1009]; see People v. Manson (1977) 71 Cal.App.3d 1, 42 [139 Cal.Rptr. 275] [The rule “guard[s] against a defendant confessing to a crime which was never committed.”].) Defendant’s statement to Hansen of present intent was part of the crime; it could not be a confession to a crime that never occurred. That statement of intent did not have to be independently proved. Accordingly, the court properly refused to give the corpus delicti instruction.[5]
14. Instructions on Felony Murder
The court instructed on felony murder as a theory of first degree murder. It also instructed that if the jury unanimously agreed defendant was guilty of first degree murder, it was not required to agree on a theory. Defendant argues that the court had to either “specify malice as an element of felony murder” or require unanimity as to theory. He is incorrect on both points. (People v. Pride (1992) 3 Cal.4th 195, 249-250 [10 Cal.Rptr.2d 636, 833 P.2d 643]; People v. McPeters (1992) 2 Cal.4th 1148, 1185 [9 Cal.Rptr.2d 834, 832 P.2d 146]; People v. Leach (1985) 41 Cal.3d 92, 101 [221 Cal.Rptr. 826, 710 P.2d 893]; People v. Dillon (1983) 34 Cal.3d 441, 472-476 [194 Cal.Rptr. 390, 668 P.2d 697]; People v. Milan (1973) 9 Cal.3d 185, 194-195 [107 Cal.Rptr. 68, 507 P.2d 956]; see Schad v. Arizona (1991) 501 U.S. 624 [111 S.Ct. 2491, 115 L.Ed.2d 555].) Defendant cites language in Dillon, where, in response to an equal protection argument, we said that “the two kinds of murder [felony murder and other types] are not the ‘same’ crimes and malice is not an element of felony murder.” (People v. Dillon, supra, 34 Cal.3d at p. 476, fn. 23.) That language, however, only meant that the elements of the two types of murder are not the same. There is still only a “single, statutory offense of first degree murder.” (People v. Pride, supra, *395 3 Cal.4th at p. 249; see also People v. Johnson (1991) 233 Cal.App.3d 425, 453-454 [284 Cal.Rptr. 579].)
Moreover, any error was harmless. The jury found defendant raped one murder victim and attempted to rape the other and found true the rape-murder special circumstance as to both and the lying-in-wait special circumstance as to Hansen. The court instructed that intent to kill was required for both special circumstances. As to both murders, therefore, the jury unanimously both agreed with a first degree felony-murder theory and found an intent to kill, i.e., express malice. (People v. McPeters, supra, 2 Cal.4th at p. 1185.)
15. Refusal to Instruct on Diminished Capacity
The court refused defendant’s request to instruct the guilt jury on diminished capacity, finding insufficient evidence “to indicate any lack of mental capacity.” Defendant contends the court erred. We disagree. The evidence was insufficient to warrant diminished capacity instructions.[6]
Defendant relies solely on testimony by witnesses who saw him around the time of the Hansen-Haertle shooting and variously said, among other things, that defendant’s speech was “weird”; that defendant had “sort of a dreamy look in his eyes”; that Haertle had told Leland Fritz he had been attacked by “ ‘a crazy man’ ”; that defendant was calm and “just in a daze, like spaced out”; and that defendant simply walked past Maureen Morse when Haertle identified him as the gunman. He presented no evidence himself to support a claim of diminished capacity. “ ‘This evidence does not amount to substantial evidence that defendant lacked the capacity to form the requisite mental states, when we compare this case with others in which we have dismissed evidence of diminished capacity as insubstantial.’ (People v. Pensinger, supra, 52 Cal.3d at p. 1241; see also the cases cited therein.) For example, in People v. Rodriguez (1986) 42 Cal.3d 730, 762 [230 Cal.Rptr. 667, 726 P.2d 113], there was testimony that the defendant had been drinking and had ‘had “a lot” ’ of cocaine, and that he was ‘ “under the influence” ’ in that he was ‘’’talkative and really hyper.” ’ We found that this ‘testimony lent only minimal and insubstantial support to appellant’s theory of diminished capacity from intoxication and therefore was not sufficient to justify the requested instruction.’ (Ibid.)” (People v. Payton (1992) 3 Cal.4th 1050, 1060 [13 Cal.Rptr.2d 526, 839 P.2d 1035].)
Here, there was neither expert testimony that defendant’s mental state was impaired in any way, nor testimony that defendant had ingested any alcohol *396 or drugs or other substance that could have affected his mental state. (See People v. Frierson (1979) 25 Cal.3d 142, 156 [158 Cal.Rptr. 281, 599 P.2d 587].) The evidence of defendant's demeanor at the crime scene, without more, falls far short of suggesting diminished capacity. For example, as the trial court pointed out, a rational person who had just killed and wanted to escape would most logically do just what defendant did—tell one person who was investigating the gunshots (Fred Morse) that someone had been shot and walk on, then continue walking calmly away when Haertle said he was the gunman rather than break into a run and draw attention to himself. The overall circumstances show a person in control, not a person incapable of intending to kill or rape. “The evidence of diminished capacity was not substantial enough to require instruction.” (People v. Pensinger, supra, 52 Cal.3d at p. 1242, fn. omitted.)
16. Instructions on Burden of Proof
Defendant argues the court erred in instructing the jury to “assume that the defendant was of sound mind at the time of the crimes and in instructing on circumstantial evidence, including use of the word “appears.” As he recognizes, we have rejected both arguments. (People v. Freeman, supra, 8 Cal.4th at p. 506; People v. Pinholster, supra, 1 Cal.4th at p. 951.) We adhere to those decisions.
17. Alleged Prosecutorial Misconduct
Defendant contends the prosecutor committed several acts of misconduct in his guilt phase rebuttal argument. As he objected to none at trial, and any harm could easily have been cured, the contentions are not cognizable on appeal. (People v. Davis, supra, 10 Cal.4th at pp. 505-506.) Throughout his brief, defendant argues any failure to object constituted ineffective assistance of counsel. We disagree. Deciding whether to object is inherently tactical, and the failure to object will seldom establish incompetence. (People v. Frierson (1991) 53 Cal.3d 730, 749 [280 Cal.Rptr. 440, 808 P.2d 1197].) Rather than acting ineffectively in this case, defense counsel represented defendant ably at all times and vigorously protected his interests.
Moreover, the claims of misconduct lack merit. At one point the prosecutor stated that defense counsel “didn’t mention the truth one time in his argument. We are trying to get at the truth here.” Defendant claims this was argument that “defense counsel has acted improperly” and an attempt to try defendant “for the shortcomings of his lawyer . . . ."On the contrary, in context, the prosecutor merely commented on the evidence—what was true and what was not. At another point, the prosecutor mentioned that defense *397 counsel was a “public defender of some 12 years’ experience . . . Defendant finds several insidious implications in the comment. It was, however, quite innocent. That defense counsel was the public defender was no secret; the prosecutor made no suggestion the jury should hold that against defendant. The prosecutor ended his argument with several references to the “measure of a society.” Defendant claims the argument “injected into the case issues broader than [defendant’s] guilt and invited the jury to render a verdict based upon public opinion.” It did not. It was merely part of the prosecutor’s unobjectionable exhortation for the jurors to consider the case carefully and base their verdicts on their “conscientious effort to get at the truth . . . .”
D. Penalty Phase Issues
1. Penalty Jury Hearing Guilt Phase Arguments
Defendant moved to prevent the penalty jury from hearing the guilt phase jury arguments. The court denied the motion: “There are an awful lot of exhibits in this case. There are so many pictures of the trail and the surrounding circumstances, there have been so many references to footprints and trees and hubs [szc] and elevations and so on— [‘JQ . . . [A]ll of these things about the site involved in the Hansen-Haertle incident and in the Scaggs incident need[] to be explained and the jury needs to be reminded over the weeks that we have been here of the earlier testimony. And they need to be shown how those things fit in from both sides of the issue . . . and they all need to hear that. So, I cannot see any potential detriment to the defense side of the case from having those people present and your motion to exclude is denied.”
Defendant contends the court erred. However, the court properly exercised its duty to control the proceedings. (Pen. Code, § 1044.) Noting that the guilt verdict was adverse to the defense on every point, defendant argues that “the penalty jurors likely read into the guilt phase verdict a unanimous rejection by the guilt phase jury of each specific point made by defense counsel during [the] guilt phase” and thus “likely gave inappropriate deference to the conclusions of the guilt phase jury.” We disagree. Being present during the guilt arguments would not cause the penalty jury to defer too much to the guilt jury. Both juries may well have agreed with some points the defense made, even though the verdict did not reflect that agreement. Moreover, contrary to defendant’s contention, having the penalty jury hear the guilt arguments did not prevent but enhanced that jury’s ability to consider any lingering doubt about guilt. (Cf. People v. DeSantis, supra, 2 Cal.4th at pp. 1239-1240.) Because the penalty jury heard the guilt phase arguments as *398 well as the evidence, it “was steeped in the nuances of the case, much as if the same jury had decided guilt and penalty.” (Id. at p. 1240.)
As the trial court pointed out, if, as is normal in capital trials, the same jury had made the guilt and penalty determinations, it would have heard all the arguments. Defendant claims this is irrelevant because the court found good cause for separate juries. Nothing in that ruling, however, made it inappropriate for the penalty jury, like a jury that decides both guilt and penalty, to hear both guilt and penalty arguments.
2. Jury Hearing of Another Murder
Before trial, the district attorney filed a notice of aggravating evidence for the penalty phase, as Penal Code section 190.3 requires. The notice included the murder of Ann Kelly Menjivar. Defendant moved for a foundational hearing to determine whether sufficient evidence supported the aggravating evidence. The court agreed to hold the hearing before the penalty phase but not before the guilt phase. During voir dire of penalty jurors, defense counsel referred to the murder of Menjivar as well as the other minders as possible evidence against defendant. Counsel typically said Menjivar was a 17-year-old student from a Catholic high school in San Francisco, that he expected the prosecution would present evidence that defendant committed the crime, and that the jury would have to be convinced beyond a reasonable doubt that defendant had committed a crime before it could consider the evidence. Counsel then asked the jurors whether, assuming they found beyond a reasonable doubt that defendant committed those crimes, they could still hear the mitigating evidence with an open mind and would consider a verdict of life without the possibility of parole. Those jurors who actually sat on the penalty jury generally said they could.
After the guilt verdict, the court held a hearing on the other crimes evidence. Based on the offer of proof, the court expressed doubt the prosecution would be able to prove that defendant murdered Menjivar. Ultimately, the prosecution did not present evidence of that murder. No one ever mentioned it to the jury except as stated above.
Defendant contends the court had to hold a hearing before selecting the penalty jury to determine whether the prosecution could prove he committed the Menjivar murder because, without that determination, defense counsel felt compelled to mention the murder during voir dire. We disagree. In People v. Phillips (1985) 41 Cal.3d 29, 72, footnote 25 [222 Cal.Rptr. 127, 711 P.2d 423], a plurality of this court stated “that in many cases it may be advisable for the trial court to conduct a preliminary inquiry before the *399 penalty phase to determine whether there is substantial evidence to prove each element of the other criminal activity." The opinion suggested the determination “should be made out of the presence and hearing of the jury." (Ibid.) The Phillips opinion, however, did not, indeed could not, require such a hearing. (People v. Clair, supra, 2 Cal.4th at pp. 677-678.) Moreover, by stating that these hearings should be held outside the jury’s presence, the plurality clearly did not intend courts to hold hearings before juries were even selected. As here, jury selection could occur months before the penalty phase began. A ruling on whether the prosecution could prove another crime long before it was required to do so might be premature. (See also People v. Frank (1990) 51 Cal.3d 718, 727 [274 Cal.Rptr. 372, 798 P.2d 1215] [“[T]he preferred time for a foundational hearing . . . would be before the penalty trial, including the prosecutor’s opening statement, commences.” (Original italics.)].)
Defendant complains the court’s refusal to hold the hearing before selecting the penalty jury forced him to choose between either not mentioning the murder during voir dire or mentioning it despite the fact it might never be proven. However, “counsel are routinely faced with difficult tactical decisions . . . .” (People v. Nicolaus, supra, 54 Cal.3d at p. 573.) Defense counsel never told the jurors defendant committed the Menjivar murder. He said only that the prosecution might present evidence to that effect. The prosecution and court never mentioned the Menjivar murder to the jury, and no evidence of it was ever presented. The court informed the jury that statements of counsel are not evidence. At the end of the penalty phase, the court listed the other crimes the jury could consider if it found beyond a reasonable doubt defendant committed them and told the jury not to consider any other criminal acts. It did not list the Menjivar murder.
Any error was harmless. Given the proof defendant committed seven murders and many other horrendous crimes, we see no reasonable possibility defense counsel’s brief reference during jury selection—months before the penalty phase—to a murder that was never mentioned again played a role in the penalty verdict. (People v. Clair, supra, 2 Cal.4th at p. 678, fn. 11; People v. Frank, supra, 51 Cal.3d at p. 728.) Defendant relies on United States v. Bland (9th Cir. 1990) 908 F.2d 471, where, in a trial for possession of a firearm by a felon, the trial court informed the jury that, when arrested, the defendant was wanted for an unrelated molestation and torture murder. There is no similarity between the court’s telling the jury such facts and defense counsel’s telling prospective jurors the prosecution might present evidence that in fact it did not present.
3. Admission of Photographs
In addition to the photographs admitted at the guilt phase, the court admitted at the penalty phase photographs of the bodies of the Marin County *400 murder victims—both where they were discovered and at the autopsy—and of each of the murder victims while alive. Defendant contends the court erred in violation of his federal constitutional rights. We disagree.
The contentions regarding the photographs of the dead bodies are cognizable. Defendant generally objected to them on the grounds urged on appeal, including federal constitutional grounds, although counsel did not always repeat all objections in discussing each individual photograph. Moreover, although the trial court lacks discretion under Evidence Code section 352 to exclude entirely evidence made admissible by Penal Code section 190.3, it does have discretion to exclude evidence “based on the form of the evidence, i.e., that a particular photograph . . . was inaccurate or cumulative.” (People v. Davenport (1995) 11 Cal.4th 1171, 1206 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) The court here did not abuse, but carefully exercised, that discretion. (People v. Crittenden, supra, 9 Cal.4th at p. 135.) It admitted some photographs of the bodies and excluded others. For example, in admitting a photograph of two of the bodies as they appeared when first discovered, the court ruled that “the remarkable similarity in the placement of the bodies, the fact that they look like they were carefully laid out side by side, either forced to lie in that position and then shot there, or shot and placed in that position, has great probative value, both on the identity of the assailant, premeditation, malice, intent, all of those things.” The autopsy photographs were admissible to show the injuries and illustrate the testimony. The court generally, although not always, admitted larger photographs instead of smaller ones because the larger showed more detail; that, too, was within its discretion.
Regarding the photographs of the victims while alive, defendant objected to those of Hansen and Alderson and to the prosecution’s using the photographs during jury argument, but did not object to the other photographs. Therefore, except for the photographs of Hansen and Alderson, defendant may not challenge their admission. (People v. Raley, supra, 2 Cal.4th at p. 895.) On the merits, there was no error. The court explained why it allowed the prosecutor to use the photographs: “The jury ought to see the faces of the folks we are talking about. Now, they have seen Carpenter’s face, you have got about 12 pictures of him, short pants, singing in the choir and performing in a play and all the rest of it. And the victims are anonymous. The jury does not have an image of just who it is. we are talking about. We know who we are talking about when it comes to Mr. Carpenter and we know who we are talking about when it comes to his ex-wife and his friends and his children and so on. So, your objection is overruled.”
Although emotion must not “reign over reason” at the penalty phase (People v. Haskett (1982) 30 Cal.3d 841, 864 [180 Cal.Rptr. 640, 640 P.2d *401 776]; see People v. Edwards, supra, 54 Cal.3d at p. 836; People v. Frank, supra, 51 Cal.3d at p. 734), photographs of the victims of the charged offenses are generally admissible. “The prosecutor was entitled to present evidence regarding ‘the circumstances of the crime’ [citation], which would at least include a photo of [the murder victim].” (People v. Frank, supra, 51 Cal.3d at p. 734.) “This evidence visually depicted a ‘circumstance of the crimes,’ portraying the victims as defendant saw them seconds before he killed them.” (People v. Cox (1991) 53 Cal.3d 618, 688 [280 Cal.Rptr. 692, 809 P.2d 351]; see also People v. Edwards, supra, 54 Cal.3d at p. 836.) Defendant cites People v. Cummings (1993) 4 Cal.4th 1233, 1329 [18 Cal.Rptr.2d 796, 850 P.2d 1], where we said a photograph of the murder victim “was not relevant to any aggravating factor.” In Cummings, however, the photograph had never been admitted, and the trial court ruled that it should not have been displayed to the penalty jury. Our language upholding the trial court’s exclusion of a photograph in that case did not overrule the earlier cases.
The admissibility of the photographs of the other murder victims is less clear but also, we think, lies within the court’s discretion. The jury is entitled to consider other criminal activity involving force or violence. (Pen. Code, § 190.3, factor (b).) As the trial court found, allowing the jury to know what the other murder victims looked like in life legitimately aided it in determining the appropriate punishment. We see no abuse of discretion. In any event, any error in admitting any of the photographs “or using them to gain a measure of sympathy from the jury, was clearly harmless in light of the other aggravating evidence in the case.” (People v. Frank, supra, 51 Cal.3d at p. 734.)
4. Evidence of Other Crimes
Defendant renews a number of arguments we have already rejected regarding evidence of other crimes. We adhere to our prior decisions. The penalty jury may consider evidence of prior unadjudicated crimes (People v. Medina (1990) 51 Cal.3d 870, 906-907 [274 Cal.Rptr. 849, 799 P.2d 1282]; People v. Balderas (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480]) and of crimes for which defendant was awaiting trial elsewhere (People v. Sims, supra, 5 Cal.4th at pp. 460-461). The court need not require the jury to decide unanimously the truth of unadjudicated crimes or make special written findings. (People v. Livaditis, supra, 2 Cal.4th at pp. 785-786.) The jury may consider evidence of criminal activity involving force or violence even if the defendant had also been convicted of those crimes. (People v. Fierro (1991) 1 Cal.4th 173, 230-231 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)
*402 Defendant argues the court erred in admitting “evidence of crimes for which charges were dismissed many years earlier as part of plea bargains, and on which the statute of limitations had expired.” He did not object on this basis at trial. At least as of the time of trial, defendant could raise the statute of limitations despite failure to object (People v. Chadd (1981) 28 Cal.3d 739, 756-757 [170 Cal.Rptr. 798, 621 P.2d 837]; cf. Cowan v. Superior Court (1996) 14 Cal.4th 367, 371-374 [58 Cal.Rptr.2d 458, 926 P.2d 438] (maj. opn.); id. at p. 393 (conc. & dis. opn. of Brown, J.)), but otherwise this contention is not cognizable. The entire argument lacks merit. (People v. Johnson, supra, 6 Cal.4th at p. 51; People v. Heishman (1988) 45 Cal.3d 147, 191-193 [246 Cal.Rptr. 673, 753 P.2d 629].) Defendant also argues that a “death-qualified” penalty jury cannot “fairly and impartially” determine the truth of unadjudicated crimes. We have not directly rejected this precise contention but have effectively done so by holding (1) a death-qualified jury may determine guilt of the charged crimes (People v. Fields, supra, 35 Cal.3d at pp. 342-353), and (2) the jury that found the defendant guilty may consider the other-crimes evidence at the penalty phase (People v. Balderas, supra, 41 Cal.3d at pp. 204-205).
The trial court overruled defendant’s objection under Evidence Code section 352 to evidence he had been convicted of escape from county jail. Defendant contends the court erred. We have held the court lacks discretion to exclude entirely evidence of a conviction specifically made admissible by Penal Code section 190.3, factor (c). (People v. Bacigalupo (1991) 1 Cal.4th 103, 140 [2 Cal.Rptr.2d 335, 820 P.2d 559].) In any event, the court certainly had discretion to admit the evidence. (People v. Rodrigues, supra, 8 Cal.4th at p. 1124.) The trial court invited defendant to put on evidence regarding the relatively innocuous facts of the escape. Defendant did so. The court properly allowed the jury to consider the evidence.
Among the criminal activity proven at the penalty phase was an incident in 1970 in which defendant confronted a woman at gunpoint, tied her hands, and stole her car. The court characterized the incident as a “car theft at gunpoint” and instructed the jury on the elements of auto theft. Defendant contends the court erred. Because the criminal activity involved force or violence, the evidence was properly admitted. (People v. Cooper (1991) 53 Cal.3d 771, 840-841 [281 Cal.Rptr. 90, 809 P.2d 865].) The court should not have instructed on auto theft, as that crime does not itself involve violence. (Id. at p. 841.) The error was, however, harmless. (Ibid.) The court could have characterized the incident as the more serious crime of robbery, which does involve force or violence. Defining the less serious crime rather than the more serious could not have prejudiced defendant. Moreover, the court instructed the jury it could not consider criminal conduct not involving violence.
*403 5. Limitations on Defense Expert Testimony
Defendant contends the court erred in sustaining certain objections to testimony by two of his expert witnesses. The rulings, however, were consistent with “well-settled principles.” (People v. Gardeley (1996) 14 Cal.4th 605, 619 [59 Cal.Rptr.2d 356, 927 P.2d 713].) When expert opinion is offered, much must be left to the trial court’s discretion. (People v. Nicolaus, supra, 54 Cal.3d at p. 582.) “An expert may generally base his opinion on any ‘matter’ known to him, including hearsay not otherwise admissible, which may ‘reasonably ... be relied upon’ for that purpose. (Evid. Code, § 801, subd. (b); In re Fields (1990) 51 Cal.3d 1063, 1070 [275 Cal.Rptr. 384, 800 P.2d 862].) On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. However, prejudice may arise if, ‘ “under the guise of reasons,” ’ the expert’s detailed explanation ‘ “[brings] before the jury incompetent hearsay evidence.” ’ (People v. Nicolaus (1991) 54 Cal.3d 551, 583 [286 Cal.Rptr. 628, 817 P.2d 893], quoting People v. Coleman (1985) 38 Cal.3d 69, 92 [211 Cal.Rptr. 102, 695 P.2d 189].)” (People v. Montiel, supra, 5 Cal.4th at pp. 918-919.) “. . . Evidence Code section 352 authorizes the court to exclude from an expert’s testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. (Coleman, supra, 38 Cal.3d at pp. 91-93.)” (Id. at p. 919.) The discretion to exclude hearsay applies to defense, as well as prosecution, expert evidence. (People v. Nicolaus, supra, 54 Cal.3d at pp. 582-583.) The trial court also has discretion to determine an expert’s qualifications. (People v. Cooper, supra, 53 Cal.3d at p. 813.)
Each of the challenged rulings came within the court’s discretion. As a whole, the court allowed the defense a reasonable opportunity to present expert testimony, while maintaining control over the presentation of unreliable or prejudicial and sometimes cumulative hearsay. Dr. Haney testified at length about defendant’s experiences while incarcerated in various institutions and the perceived failure of those institutions to treat him. During this testimony, the court sustained some hearsay objections. For example, the defense sought to present a 1947 newspaper article, with 16 photographs, regarding conditions of confinement at the Napa State Hospital where defendant had been incarcerated. While the court allowed much testimony about conditions at the hospital at the time, it excluded the article and all but two of the photographs, ruling: “. . . this is not a reliable piece of hearsay, it is a sensational article written in sensational fashion, the thrust of which is on a grand jury investigation of an alleged patient beating death and . . . it’s to my mind unreliable hearsay and I do not intend to admit it. [1 Now, you have already established that. I won’t go through what you *404 have established with his testimony, but a lot of things about the Napa hospital facility, probably as many things about that facility as could possibly have any significance here.” The court’s exclusion of the hearsay as unreliable was within its discretion. “Of course, any material that forms the basis of an expert’s opinion testimony must be reliable.” (People v. Gardeley, supra, 14 Cal.4th at p. 618.)
Over prosecution objection, the court allowed Dr. Haney to testify about how defendant had escaped from county jail, testimony indicating lax security. When Dr. Haney tried to testify about security arrangements in state prison, the court found the subject beyond the witness’s expertise. Defendant challenges the ruling, but it, too, came within the court’s discretion. In any event, the defense was allowed to make its point—that security at a maximum security prison would be tighter than at the Calaveras County jail.
The defense also presented a social worker who testified extensively about defendant’s abusive childhood. The court sustained a few objections to her testimony. For example, the court admitted into evidence a “two-and-a-half-page, single-spaced, typewritten letter,” but did not allow the witness to read it aloud to the jury. It limited the witness’s testimony about why defendant’s parents allegedly abused him, ruling: “Your evidence so far has certainly been convincing that [defendant] had an unhappy childhood and that he was mistreated by his parents, . . . and that he ends up in the juvenile system at the age of eight or nine. ...[HI can’t see why the reasons that his parents may have done what they did have any significance here, plus the fact I am still not satisfied with your witness’s testimony as to her qualifications to give that opinion because . . . she has not satisfied my mind that she knows the reasons why one human being treats their children in a certain way.” These and other rulings also came within the court’s discretion.
Defendant argues the rulings violated his constitutional right to present all relevant mitigating evidence. (Skipper v. South Carolina (1986) 476 U.S. 1, 4 [106 S.Ct. 1669, 1670-1671, 90 L.Ed.2d 1].) They did not. The rule allowing all relevant mitigating evidence has not “abrogated the California Evidence Code.” (People v. Edwards, supra, 54 Cal.3d at p. 837.) “[T]he trial court determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury.” (People v. Fauber, supra, 2 Cal.4th at p. 856.) The trial court allowed defendant reasonably wide latitude to present his mitigating evidence consistent with California law of evidence. The few restrictions it placed on the extensive expert testimony neither abused its discretion nor violated defendant’s right to present mitigating evidence.
*405 6. Prosecution Expert Rebuttal Evidence
Drs. Haney and Pierce testified that defendant suffers from a “personality disorder” that affected his criminal behavior. On rebuttal, the prosecution presented expert testimony of Drs. Thomas Szasz and Stanton Samenow. Defendant contends the court should not have permitted either to testify.
a. Dr. Szasz
Most of the argument regarding Dr. Szasz is not cognizable because defendant failed to object at trial on the grounds he currently asserts. Before Dr. Szasz testified, defendant asked for an offer of proof, which the court denied. Defendant also asked for an advance ruling limiting the witness’s testimony. The court refused: “You are asking me to rule in advance on something that is simply incapable of an advanced ruling. [^Q So, when his testimony comes up, you object at the time and we will pass at the time. We will see how it goes.” Defendant objected generally that the testimony was irrelevant because “the issue of legal responsibility is not a contested issue at the penalty phase of this proceeding.” The court expressed tentative agreement. The prosecutor clarified that he was offering the witness on the subject of defendant’s claim "of “diminished responsibility.” With that clarification, the court overruled defendant’s objection. Defense counsel stated he would “renew [his] objection if it’s not clear.” Defendant later objected to any suggestion that he was claiming lack of “legal responsibility” for his crimes. He did not object to the witness’s testimony on any other basis. The court made clear to the jury that defendant was not raising either a defense of “insanity” or “diminished capacity,” but otherwise it allowed the witness to testify. Defendant himself elicited some of the testimony he challenges.
Defendant has thus preserved only an objection that the testimony was irrelevant to the extent it was directed to a claim of complete lack of legal responsibility. (See People v. Danielson (1992) 3 Cal.4th 691, 729 [13 Cal.Rptr.2d 1, 838 P.2d 729].) He argues the court erroneously overruled that objection. We disagree. Although defendant did not disclaim all responsibility for his actions, he certainly tried to diffuse responsibility. He claimed a “personality disorder” affected his actions and blamed many others, including his parents and penal institutions, for his criminal career. The court made clear to the jury defendant was not claiming a complete lack of responsibility for his crimes. But the rebuttal testimony properly responded to the evidence the defense did present.
The entire contention also lacks merit. Dr. Szasz testified about the definition and significance of a “personality disorder.” He believed a personality disorder “is nothing like a disease at all. This is a psychiatric, *406 somewhat excessively pompous and complicated term to redescribe the personality characteristic traits, habits of a person, persons.” A personality disorder does not exist the way “a table exists,” he testified, but “is simply a name for how people behave . . . .” “It’s another way of describing criminal acts, especially habitual criminality. Psychiatrists are in the habit of describing people that lawyers call criminals as psychopaths or having personality disorders. It’s another way of describing the same way.” The witness opined “that it is quite false, virtually, I would say meaningless, to contend that a personality disorder can cause criminal conduct” because “it is a name of that criminal conduct. It is not something separate that causes something.”
Contrary to defendant’s argument, this testimony was a proper subject of expert opinion testimony. The meaning of the term “personality disorder” certainly relates “to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the” jury. (Evid. Code, § 801, subd. (a).) The testimony was also proper rebuttal. Defendant’s experts testified he had a personality disorder. Dr. Szasz responded, in essence, that this diagnosis was of little help in evaluating defendant, for defendant’s personality disorder was simply that he killed people and committed other crimes. Calling defendant’s criminal conduct a disorder described that conduct, but not its cause. Pulling from context a few lines of Dr. Szasz’s testimony, defendant asserts, “the gist of his testimony was that he had no expertise to offer.” On the contrary, the witness offered expertise, although his opinions differed from those of defendant’s experts.
Defendant argues the testimony violated his right to the assistance of experts (Ake v. Oklahoma (1985) 470 U.S. 68 [105 S.Ct. 1087, 84 L.Ed.2d 53]) by “foster[ing]” a belief “that the defendant ought not to have a right to present such testimony [by psychologists] at all.” Defendant, however, did receive full assistance of experts. Nobody challenged his right to present expert testimony; the prosecution merely presented contrary expert testimony. The right to the assistance of experts does not include the right to present testimony free from rebuttal by differing expert views. Psychological and psychiatric evidence, although admissible in court, is not beyond challenge. (People v. Clark (1993) 5 Cal.4th 950, 1019 [22 Cal.Rptr.2d 689, 857 P.2d 1099] [upholding testimony “regarding the doubtful value of certain psychiatric testimony”]; People v. Danielson, supra, 3 Cal.4th at pp. 729-730 [same].) “Psychiatry is not. . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a *407 given case, juries remain the primary factfinders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party” (Ake v. Oklahoma, supra, 470 U.S. at p. 81 [105 S.Ct. at p. 1095], italics added.)
Defendant also complains that near the end of his direct examination, Dr. Szasz “rendered an opinion in terms of the legal standards for insanity.” This testimony related to the extent to which defendant understood the nature of, and had the ability to control, his behavior. As such it was relevant rebuttal.
b. Dr. Samenow
Dr. Samenow testified “as an expert in the area of psychology and criminal behavior.” As a foundation to his opinion regarding defendant, the witness testified about a study he and a colleague had conducted of 255 persons who had committed serious crimes. Twice defendant objected on relevancy grounds. He argued that if the witness “wants to talk about my client’s problems, or lack of problems, that is one thing, but his study is irrelevant to this proceeding.” The court overruled the objections, finding that the testimony was “foundational.” After discussing his study and the conclusions he drew from it, Dr. Samenow testified about defendant himself. He reviewed various materials about defendant and the crimes of this case and interviewed three persons who knew defendant, including his first wife. He testified that “very much like the people in the study that I have been talking about, from what I have read, Mr. Carpenter was calculating, intentional, and planning in that which he did.” He testified at length about his conclusions and the bases for them, drawing both on his study and material regarding defendant himself.
Defendant contends Dr. Samenow’s “testimony was irrelevant because it violated an essential principle of Eighth Amendment law: that sentencing be individualized.” The Attorney General argues the contention is not cognizable because defendant objected only on relevancy grounds and not on Eighth Amendment grounds. We agree the constitutional argument is not cognizable, but the relevancy argument—which is the substance of his claim—is preserved. Defendant may argue that the evidence was irrelevant in that it was outside the scope of proper penalty phase rebuttal evidence. The argument lacks merit, however. Defendant states, “To satisfy the Eighth Amendment, a capital sentencing procedure must treat defendants as ‘uniquely individual human beings,’ not as ‘members of a faceless, undifferentiated mass’ of criminals. (Sumner v. Shuman (1987) 483 U.S. 66, 74-75 [107 S.Ct. 2716, 2722, 97 L.Ed.2d 56], quoting Woodson v. North Carolina (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 96 S.Ct. 2978].)” Nothing in Dr. Samenow’s *408 testimony violated this rule. The penalty jury certainly learned of defendant as a “uniquely individual human being[]”; it heard a massive amount of evidence about defendant, including testimony from Dr. Samenow himself. Sumner v. Shuman (1987) 483 U.S. 66 [107 S.Ct. 2716, 97 L.Ed.2d 56], which defendant cites, is not relevant to this issue. That decision invalidated a mandatory death penalty. California has no mandatory death penalty. The high court has never suggested that expert opinion about the defendant may not be founded upon underlying objective scientific research. The court properly allowed the testimony about the study as foundational to Dr. Samenow’s opinion regarding defendant himself.
Defendant also complains that Dr. Samenow never interviewed him. There was a good reason for the lack of a personal interview. Despite a court order, defendant refused to talk to Dr. Samenow. (See post, pt. II. D. 9.) Defendant also argues that in the later trial for the Marin County crimes (see ante, fn. 1), the court disallowed evidence about the study. The argument, based on events occurring after this trial, is not cognizable on direct appeal. (People v. Sanchez (1995) 12 Cal.4th 1, 59 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) Moreover, a ruling by a different court in a different trial has no bearing on the correctness of the rulings in this trial.
7. Other Prosecution Evidence
Defendant argues the court erroneously admitted other items of evidence. As to some, he argues preliminarily the court did not indicate it had balanced the probative value against any prejudicial effect. As noted before, however, the record as a whole indicates the court was well aware of, and consistently performed, its duty in this regard. (People v. Crittenden, supra, 9 Cal.4th at p. 135.) The rulings also all came within the court’s discretion.
A defense witness testified she “socialize[d]” with defendant a “good deal”; they “just would get together and talk.” She described defendant as “a good friend. He was very bright, perceptive, good sense of humor, and very generous, very considerate.” On cross-examination, over objection, the prosecution elicited testimony that the witness and defendant had once had a “sexual” relationship. This cross-examination was proper to show bias and help the jury evaluate the rest of the witness’s testimony. (People v. Fierro, supra, 1 Cal.4th at p. 234; Evid. Code, § 780, subd. (f).)
Some of the evidence rebutted the defense case-in-mitigation. (People v. Boyd (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782].) [T]he scope of rebuttal must be specific, and evidence presented or *409 argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf,” but once a defendant “placed his general character in issue, the prosecutor was entitled to rebut with evidence or argument suggesting a more balanced picture of his personality.” (People v. Rodriguez (1986) 42 Cal.3d 730, 792, fn. 24, 791 [230 Cal.Rptr. 667, 726 P.2d 113]; see In re Ross (1995) 10 Cal.4th 184, 207-208 [40 Cal.Rptr.2d 544, 892 P.2d 1287].) The scope of rebuttal lies within the trial court’s discretion. (People v. Rodrigues, supra, 8 Cal.4th at p. 1164.) Here, as the court noted, the defense presented a wide range of mitigating evidence that warranted a wide range of rebuttal. “You [the defense] put his character in issue. You talked about his childhood, you talked about his parents, you talked about his siblings, you talked about his schooling, all of his life experiences. You talked about his attitude while he was in custody. You talked about his relationship with custodial officials and custodial nonofficials, the plumber, and that’s character and is nothing else but character. [1 . . . You brought in his children, who testified that they loved him, that he was there when they needed him when they were having problems with their mother and stepfather.”
Defendant complains of testimony that defendant once suggested to a 14-year-old girl that she engage in “sexual contacts” with “older men” for money. The Attorney General argues the issue is not cognizable because defendant failed to object. We disagree. Although the record is not entirely clear, we think defendant adequately objected to all of the witness’s testimony as beyond the scope of proper rebuttal. The contention, however, lacks merit. Defendant presented evidence that he was “very considerate,” “totally respectful” to one witness “as a woman,” and was very good with his children. Evidence painting a different picture was admissible.
Defendant complains of rebuttal evidence, to which he objected on relevancy grounds and under Evidence Code section 352, indicating that he had returned to the crime scene a few days after shooting Hansen and Haertle and urinated on the spot where Hansen’s head had lain. This evidence, suggesting defendant’s contempt for his victims and indifference to his actions, was also admissible to present a more balanced picture of his personality.
The prosecution called defendant’s employer on rebuttal. The court sustained a defense objection to much of his testimony but allowed him to testify that defendant’s demeanor appeared normal during conversations around the time of the crimes. The evidence properly tended to rebut defense expert opinion suggesting that at the time of the crimes, defendant had “become impulsive, out of control, and expansive, in a state that is ... a hypermanic state . . . .”
*410 Defendant argues the court erroneously allowed a prosecution expert to testify about hearsay statements that defendant had referred to himself as “ ‘Devious Dave,’ ” and that he “would frequently discuss committing perfect crimes and bragging about his Mafia connections.” As discussed above, however, an expert may base his opinion on hearsay. “Because an expert’s need to consider extrajudicial matters, and a jury’s need for information sufficient to evaluate an expert opinion, may conflict with an accused’s interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court’s sound judgment.” (People v. Montiel, supra, 5 Cal.4th at p. 919.) The court carefully exercised its discretion in this regard throughout the trial. Moreover, the court admonished the jury “again, these statements are hearsay and they are not admitted to show the truth of the thing that is asserted. It is only admitted to show the information on which the doctor is basing his opinion.”
Defendant also argues that the court’s rulings regarding expert use of hearsay and other matters “cannot be logically reconciled among themselves in any other way than that they all favored the prosecution.” Again, we disagree. During the course of the lengthy, hotly contested trial, the court had to make many rulings. Some favored the prosecution, some the defense. Obviously, in this appeal, defendant challenges only those rulings that favored the prosecution. But on the whole, the court treated both parties fairly in its rulings, including those permitting or disallowing specific use of hearsay. Each ruling was made independently of the others, in unique circumstances. The claim of overall bias has no more merit than the individual claims of error.
Defendant also complains the court erroneously allowed the prosecution to ask leading questions of the defense experts that, he claims, presented prejudicial matter to the court even when the court sustained defense objections. Our review of the record convinces us the court acted within its discretion. It also continually admonished the jury that questions by counsel are not evidence. We see no error and no prejudice.
8. Alleged False Evidence
As noted {ante, pt. II. D. 7), the court admitted rebuttal evidence indicating defendant had urinated on the spot where Hansen’s head had lain. In addition to arguing the evidence was improper rebuttal, an argument we have rejected, defendant claims it was “false evidence.”
The witness presenting the evidence testified that a few days after the killing of Ellen Hansen, a fresh set of shoeprints appeared at the crime scene. *411 He said the “class characteristics” of the new prints were the “same” as those of the gunman. He identified a photograph of one of the new prints. The person who placed the new prints apparently urinated on the spot where Hansen’s head had lain, even though the spot was not marked in any way. Defendant argues that “a careful comparison of [the photograph of the new print] with the prints left by the perpetrator on March 29 reveals they could not have been made by the same shoe.” Specifically, he claims that the gunman’s shoeprint contains 28 or 29 ridges in a certain area, but the later print contains 31 or 32 ridges in that area. We have examined the exhibits. At first glance the shoeprints appear to be identical. Upon closer inspection, however, there does seem to be a slight discrepancy in the number of ridges. Whether this is because different shoes made the prints or because of the nature and quality of the prints is beyond this court’s expertise. Neither side presented evidence on the question.
Defendant argues that the prosecution knew or should have known the evidence was false and failed to disclose material evidence favorable to a defendant in violation of Brady v. Maryland (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215]. We disagree. Because the claim of false evidence is based on information available to defendant at trial, and he did not object on this basis, the claim is not cognizable on appeal. (People v. Marshall (1996) 13 Cal.4th 799, 830-831 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) So far as the record shows, the defense, as well as the prosecution, had the opportunity to compare the shoeprints, and thus the veracity or falsity of the evidence was equally apparent to both sides. The prosecution knew nothing the defense did not know. Defendant argues that in his later trial for the Marin County crimes, the defense presented evidence that he did not return to the crime scene, and that, in response, the prosecution suggested the prints may have been different. The argument is not cognizable on direct appeal. (People v. Sanchez, supra, 12 Cal.4th at p. 59.) Moreover, any later argument by a different prosecutor cannot change the fact that the defense knew as much about the photographs as did the prosecution and could have drawn the same inferences defendant now draws.
Defendant also argues the court should not have admitted the evidence without sufficient foundational evidence the prints were identical. The claim is not cognizable, however, because defendant did not object on foundational grounds. (People v. Zapien, supra, 4 Cal.4th at p. 979.) The court has no sua sponte duty to exclude evidence. (People v. Montiel, supra, 5 Cal.4th at p. 918.) Moreover, the witness’s testimony that the shoeprints had the same characteristics as the gunman’s prints would appear to be a sufficient foundation at least absent evidence or argument to the contrary.
Defendant also argues defense counsel was ineffective. However, even if we assume counsel should have challenged the evidence, and either caused *412 its exclusion or at least urged the jury to compare the prints and decide for itself whether they were identical (the record does not indicate whether the jury examined the relevant exhibits during deliberations), we find no prejudice.[7] The evidence that defendant urinated at the crime scene, although relevant rebuttal, was extremely minor in the overall trial in light of the evidence that defendant murdered seven people on several separate occasions and committed many other serious crimes over many years. We find no reasonable probability any deficient performance by counsel affected the penalty verdict. (People v. Frank, supra, 51 Cal.3d at pp. 734-735.) Indeed, even if we assume error in admitting the evidence, it is not reasonably possible the error affected the verdict (People v. Brown (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135]) or, assuming federal constitutional error, it is harmless beyond a reasonable doubt (Chapman v. California (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; see People v. Ashmus (1991) 54 Cal.3d 932, 990 [2 Cal.Rptr.2d 112, 820 P.2d 214]).
9. Ordering Defendant to Submit to a Mental Examination
After the defense presented expert testimony about defendant’s mental condition, the prosecution moved to compel defendant to submit to a psychiatric examination. Over defense objection, the court granted the motion, but ordered the examiner to ask defendant no questions regarding the Marin County crimes. It advised defendant that anything he said could be used against him. The psychologist, Dr. Samenow, testified over objection that, although he informed defendant he would not ask any questions about the Marin County crimes, defendant refused to talk to him. The court instructed the jury it had ordered defendant to submit to a psychological examination, and his “refusal to be examined by the prosecution’s doctor may be considered by you. If you find that the defendant’s refusal to answer questions or to be interviewed was willful, you may take that fact into consideration when weighing the opinions of the defense experts in this case.”
Defendant contends the initial ruling, the testimony, and the instruction all violated his federal constitutional rights. “We disagree. By tendering his mental condition as an issue in the penalty phase, defendant waived his Fifth and Sixth Amendment rights to the extent necessary to permit a proper examination of that condition. Therefore, those rights were not violated when the examining psychiatrist testified to defendant’s refusal to cooperate.” (People v. McPeters, supra, 2 Cal.4th at p. 1190, citing Buchanan v. Kentucky (1987) 483 U.S. 402 [107 S.Ct. 2906, 97 L.Ed.2d 336].)
*413 Defendant argues the trial predated McPeters and Buchanan, and therefore defense counsel could not have known what the law was. The argument is unpersuasive. The two decisions logically followed others predating the trial. (E.g., Estelle v. Smith (1981) 451 U.S. 454, 465 [101 S.Ct. 1866, 1874, 68 L.Ed.2d 359], quoted in Buchanan v. Kentucky, supra, 483 U.S. at p. 422 [107 S.Ct. at p. 2917]; People v. Danis (1973) 31 Cal.App.3d 782, 786 [107 Cal.Rptr. 675].) Moreover, even if the law was not entirely clear at trial, the court’s ruling was clear. Defendant had the right to challenge that ruling on appeal, which he now does, but at trial, he had to accept it. Contrary to defendant’s contention, the order that he submit to an examination was not ambiguous. Defendant had no right to refuse to cooperate with the psychologist, so the jury could properly consider his refusal. (See People v. Johnson, supra, 3 Cal.4th at pp. 1221-1224 [evidence that the defendant refused to stand in a lineup properly admitted].) The jury could properly infer that defendant wanted only his self-chosen experts, not others, to evaluate him, an inference relevant to its consideration of all the evidence of his mental condition.
10. Alleged Prosecutorial Misconduct
Defendant contends the prosecutor committed numerous acts of misconduct. As indicated below, he did not object to many and thus failed to preserve those contentions. (People v. Garceau (1993) 6 Cal.4th 140, 206 [24 Cal.Rptr.2d 664, 862 P.2d 664, 3 A.L.R.5th 3951].) Rather than repeat this statement as to each contention, we hold here that defendant has preserved only those contentions we discuss below to which we specifically note he objected. Each contention also lacks merit.
During voir dire of the penalty jury, three times over objection, the prosecutor suggested the jurors could consider the fact the victims were hiking in a remote area and thus were vulnerable. He later argued to the jury without objection that the victims were particularly vulnerable, partly because they were assaulted on hiking paths. Defendant claims that to “be a valid aggravating consideration, ‘vulnerability’ must be confined to inherent vulnerability, e.g., age, youth, or infirmity, and must not be extended to include any additional vulnerability caused by the manner in which the victim is attacked.” We disagree. In determining the appropriate punishment, the jury may consider the “circumstances of the crime . . . .” (Pen. Code, § 190.3, factor (a).) Indeed, “among the most significant considerations are die circumstances of the underlying crime.” (People v. Mitcham, supra, 1 Cal.4th at p. 1062.) The prosecutor could argue, and the jury could consider, that defendant attacked when his victims were alone on hiking trails and were easy targets. Defendant claims the prosecutor’s argument “infringed upon [his] constitutional right to seek a change of venue.” It did not.
*414 Defendant claims the prosecutor “grossly misstated the nature of the weighing the jury was required to perform.” He did not object. Moreover, we find no misconduct. The prosecution argued, as it was entitled, that the mitigating evidence did not outweigh the seriousness of the crimes, i.e., the lives that defendant took. The defense argued the opposite, as it was entitled. It was left for the jury to decide. “That is the nature of the adversarial process.” (People v. Edwards, supra, 54 Cal.3d at p. 844.)
Defendant argues the prosecutor twice violated the rule of Griffin v. California (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]. He objected both times. The prosecutor argued there was no evidence defendant had shown remorse. Given the immense amount of evidence about defendant’s mental state and attitude around the times of the crimes, the argument was proper. (People v. Beardslee, supra, 53 Cal.3d at p. 114.) He also argued “that the why of this, the why of seven innocent deaths, of the other crimes, is only known by one person. And assuming that that person would tell the truth about the why,—” The court overruled a defense objection at this point but cautioned the prosecutor to be more careful. The ruling and caution were within its discretion. In light of the substantial expert evidence on defendant’s mental state and how it related to the crimes, some based on examinations of defendant, the vague reference to defendant knowing the “why” could not reasonably be construed as a comment on his failure to testify. (People v. Crittenden, supra, 9 Cal.4th at p. 147.)
The prosecutor argued without objection that the “why” of the crimes is not a statutory factor. Defendant contends that, on the contrary, the “why” is “relevant to many of the sentencing factors . . . .” He is no doubt correct. The prosecutor (and defense counsel) discussed the reason for the crimes as it related to the sentencing factors. But the prosecutor was correct that the reason was not, itself, a statutory factor. We find no impropriety.
Without objection, the prosecutor, discussing the statutory factor of the age of the defendant (Pen. Code, § 190.3, factor (i)), compared the defendant’s age with that of his victims. The comparison was appropriate. Both sides at the penalty phase are entitled to argue their views of the evidence as it relates to the statutory factors. (People v. Fierro, supra, 1 Cal.4th at p. 242.) Moreover, the victims’ ages were relevant as circumstances of the crimes. Without objection, the prosecutor argued that Penal Code section 190.3, factor (j)—whether the defendant was an accomplice— was aggravating because defendant acted alone. We have not decided whether factor (j) can be considered aggravating. (People v. Proctor (1992) 4 Cal.4th 499, 553 [15 Cal.Rptr.2d 340, 842 P.2d 1100].) We need not decide the question here. In addition to the fact defendant failed to preserve *415 the contention, the jury could certainly consider that defendant acted alone as a circumstance of the crime. It mattered little whether the jury considered it in relation to factor (j) or factor (a). Defendant also complains that the prosecutor argued, without objection, that “the test for that is completely up to you.” In context, the prosecutor properly argued it was for the jury to decide what evidence was mitigating and what was aggravating. Also without objection, the prosecutor said the jury did not know much about Hansen “because the law doesn’t allow that,” described her as “intelligent and bright and sensitive,” and said she was killed “for very selfish reasons” that “we . . . aren’t privy to.” These innocuous statements did not exceed the scope of reasonable argument. The prosecutor implied no criticism of the law. The factual arguments, here and elsewhere, were based on reasonable inferences from the evidence.
Without objection, the prosecutor argued, “This defendant robbed [Hansen] ... of her birthright, of her future, of children that she may have had, of what contribution she could have made, large or small, to this world. And he had no right.” Again, we see no impropriety. It is indisputable that defendant did rob his young murder victim of all that the district attorney stated; that is part of the injury the defendant inflicted and, as such, may be considered as a circumstance of the crime. (People v. Edwards, supra, 54 Cal.3d at pp. 835.) Although, as noted above, emotion must not “reign over reason” (People v. Haskett, supra, 30 Cal.3d at p. 864), this reference to the consequences of defendant’s actions did not cross the line.
Without objection, the prosecutor stated he had hesitated whether to call the victims of defendant’s earlier crimes as witnesses, “But they wanted to do that, they thought it was important ... for you to know what those surviving, living, human beings, living victims, had to experience at the hands of this defendant.” While any difficulty about the prosecutor’s decision was technically not part of the evidence, the comment was innocuous. It did not imply the victims believed defendant should receive the death sentence. Defendant contends certain prosecution comments, to none of which he objected, “misled the jury concerning the nature of the decision they were to make.” We have reviewed each alleged instance in context and disagree. Without objection, the prosecutor invited the jury to put itself in the victims’ “shoes.” The argument was proper. (People v. Garceau, supra, 6 Cal.4th at p. 206; People v. Haskett, supra, 30 Cal.3d at pp. 863-864.) We have reviewed defendant’s remaining claims of misconduct, none of which he preserved, and find no improprieties.
Defendant claims the argument as a whole invited the jury to make an unguided emotional, rather than a reasoned moral, response to the evidence. *416 We disagree. Even if we were to assume an occasional improper implication, the argument focused on the aggravating and mitigating factors. It reasonably, although vigorously, presented the prosecution’s view of the evidence within the confines of the law, just as the defense argument presented the defense view. The argument was fair and did not mislead the jury.
11. Instructions on Mitigating Evidence
The court gave the “catch-all” mitigation instruction we recommended in People v. Easley (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813], footnote 10. Defendant also requested many special instructions pinpointing mitigating evidence the jury could consider. He complains the court refused to give most of them. The court, however, did not have to give any of them. (People v. Daniels, supra, 52 Cal.3d at pp. 870-871; People v. Benson (1990) 52 Cal.3d 754, 804-806 [276 Cal.Rptr. 827, 802 P.2d 330].) “The Easley instruction ... is sufficient to advise the jury of the full range of mitigating evidence, and nothing more is required.” (People v. Edwards, supra, 54 Cal.3d at pp. 841-842; see also Boyde v. California (1990) 494 U.S. 370, 377-383 [110 S.Ct. 1190,1196-1199, 108 L.Ed.2d 316].) Defendant also contends the court erred by refusing to delete the word “extreme” from “extreme mental or emotional disturbance.” (Pen. Code, § 190.3, factor (d).) It did not. (Blystone v. Pennsylvania (1990) 494 U.S. 299, 308 [110 S.Ct. 1078,1084, 108 L.Ed.2d 255]; People v. Benson, supra, 52 Cal.3d at pp. 803-804.)
Defendant complains that the court gave “a pinpoint instruction on the prosecution’s aggravating evidence while denying reciprocal rights to such an instruction to a capital defendant.” But there is a critical difference between mitigating evidence and aggravating evidence. The jury may consider in aggravation only evidence relevant to the factors listed in Penal Code section 190.3. (People v. Boyd, supra, 38 Cal.3d 762.) By contrast, the jury may consider any mitigating evidence. To inform the jury, the court had to define and limit what aggravating evidence it could consider, but it did not have to define and could not limit the range of mitigating evidence. The lack of symmetry in the jury’s consideration of aggravating and mitigating factors explains the lack of symmetry in the instructions. (See also People v. Benson, supra, 52 Cal.3d at p. 806.)
Defendant also complains the court itemized the other crimes involving force or violence for which evidence was presented and told the jury not to consider evidence of any other criminal acts. Although there is no sua sponte duty to identify the other crimes (People v. Hardy, supra, 2 Cal.4th at pp. 205-206), doing so is not error. (People v. Phillips, supra, 41 Cal.3d at pp. 72-73, fn. 25.)
*417 The court instructed the jury it could consider the other crimes only if it found defendant committed them beyond a reasonable doubt. It also instructed that as to “all other aggravating or mitigating circumstances, the standard of proof is by a preponderance of the evidence”; and that in deciding this question, the jury “should consider all of the evidence bearing upon that issue regardless of who produced it.” Defendant contends the court erred in instructing on the preponderance-of-the-evidence standard.
It is clear there was no federal constitutional violation. The United States Supreme Court has stated that, although it “has refused to countenance state-imposed restrictions on what mitigating circumstances may be considered in deciding whether to impose the death penalty,” the state may impose “on defendants the burden of establishing, by preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency.” (Walton v. Arizona (1990) 497 U.S. 639, 649 [110 S.Ct. 3047, 3055, 111 L.Ed.2d 511] (plur. opn. of White, J.); see also id. at pp. 669-673 [110 S.Ct. at pp. 3065-3068] (conc. opn. of Scalia, J.).) “So long as a State’s method of allocating the burdens of proof does not lessen the State’s burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant’s constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.” (Walton v. Arizona, supra, 497 U.S. at p. 650 [110 S.Ct. at p. 3055] (plur. opn. of White, J.); see also Delo v. Lashley (1993) 507 U.S. 272, 276 [113 S.Ct. 1222, 1224, 122 L.Ed.2d 620] [“In Walton we rejected a challenge to a state statute that imposed on capital defendants the burden of establishing the existence of mitigating circumstances by a preponderance of the evidence . . . .”].)
The California death penalty statute is silent on the burden of proof, and we have not squarely considered the question. As defendant points out, we have stated that “the jury is not limited in its consideration of any evidence in mitigation which could serve as a justification for imposition of a penalty less than death.” (People v. Bonillas (1989) 48 Cal.3d 757, 790 [257 Cal.Rptr. 895, 771 P.2d 844].) However, the court did not limit what the jury could consider but merely defined the burden of proof. Indeed, it specifically told the jury to “consider all of the evidence . . . .” The real problem is that the instruction does not readily apply to the decisionmaking process involved in the penalty phase of a capital trial. “[T]he sentencing function is inherently moral and normative, not factual; the sentencer’s power and discretion under [California’s death penalty law] is to decide the appropriate penalty for the particular offense and offender under all the relevant circumstances.” (People v. Rodriguez, supra, 42 Cal.3d at p. 779.) Because of this, instructions associated with the usual fact-finding process—such as burden *418 of proof—are not necessary. (Id. at pp. 777-779; see also People v. Edwards, supra, 54 Cal.3d at pp. 842-843; People v. Bonillas, supra, 48 Cal.4th at pp. 789-790 [trial court did not err in failing to instruct on the standard of proof applicable to circumstances in mitigation].) Except for the proof of other crimes, the court should not have instructed at all on the burden of proving mitigating or aggravating circumstances.
Nevertheless, the instruction did not prejudice defendant. It was logically relevant only to mitigating circumstances for which the evidence was conflicting, primarily the evidence of defendant’s mental state. It told the jury to consider all the evidence and made clear the defendant did not have the burden of proving a mitigating circumstance beyond a reasonable doubt. Even without the instruction, we doubt that any jury would give an aggravating or mitigating circumstance significant weight if, after considering the evidence supporting that circumstance, it found the contrary evidence preponderated. Therefore, we find no reasonable possibility the instruction affected the penalty verdict. (People v. Brown, supra, 46 Cal.3d at pp. 446-448.) It was inapplicable, but not prejudicial.
12. Instruction on Weighing Aggravating and Mitigating Factors
As this case was tried before our decision in People v. Brown, supra, 40 Cal.3d 512, the court gave the then standard instruction: “If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."
Although the United States Supreme Court has upheld this instruction (Blystone v. Pennsylvania, supra, 494 U.S. 299; Boyde v. California, supra, 494 U.S. at pp. 374, 376-377 [110 S.Ct. at pp. 1194-1196]), we have found that it “and particularly use of the word ‘shall’ is potentially misleading in two respects. First, the jury might erroneously infer that it could perform the balancing or weighing process in a mechanical fashion by comparing the number of factors in aggravation with those in mitigation, or by an arbitrary assignment of weights to the factors. Second, the jury might fail to understand that a juror is not required to vote for the death penalty unless, as a result of the weighing process, the juror personally determines that death is the appropriate penalty under all the circumstances. To determine whether the jury may have been misled to defendant’s prejudice in either respect, we examine the entire record. [Citations.]" (People v. Cooper, supra, 53 Cal.3d at pp. 844-845.)
*419 Here, additional instructions “virtually eliminated any risk that the jury would be misled as to its sentencing discretion or as to the process of penalty determination.” (People v. Cooper, supra, 53 Cal.3d at p. 845.) The court instructed that the jury “must not simply add up the number of circumstances on each side and make your determination based on the greater or lesser number of circumstances involved. [•][]... [This] mean[s] that you are not to decide the penalty in this case by the simple process of counting the number of circumstances that have been proved by the opposing sides. [H It means that the final test is not in the relative number of circumstances, whether mitigating or aggravating, but in their relative weight and convincing force. Any circumstance, whether in mitigation or aggravation, standing alone may be sufficient to support a decision as to the penalty to be imposed, provided that the circumstance outweighs all of the circumstances in opposition to it.” This instruction made clear the weighing process was not mechanical and, by informing the jurors they should decide the weight and force of the factors, ensured they understood they had discretion to determine the appropriate penalty. (Ibid.)
The prosecutor never suggested the weighing process was mechanical or the jury had no discretion. Defendant contends remarks near the end of the prosecution’s jury argument were misleading. (See People v. Edelbacher, supra, 47 Cal.3d at pp. 1038-1041 (lead opn. of Kaufman, J.).) We disagree. The prosecutor appropriately urged the jury to decide the penalty “on the basis of the evidence” and stated that its “responsibility is to weigh the evidence.” Defendant argues that comments during jury selection also misled the jury. Our review of the record convinces us otherwise. (See also People v. Proctor, supra, 4 Cal.4th at pp. 547-548; People v. DeSantis, supra, 2 Cal.4th at pp. 1243.) Defendant meritlessly argues the court should have instructed on what the jury should do if it found the aggravating and mitigating circumstances of equal weight. (People v. Hayes (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376].) Reviewing the entire record, we find no reasonable likelihood the jury was misled as to the scope of its sentencing responsibility. (People v. Proctor, supra, 4 Cal.4th at p. 549.)
13. Constitutionality of California’s Death Penally Law and Other Contentions
Defendant argues the California death penalty law in general, and the lying-in-wait and rape-murder special circumstances in particular, do not meaningfully distinguish between first degree murders that are death eligible and those that are not. We have rejected the contentions. (People v. Crittenden, supra, 9 Cal.4th at pp. 154-156; People v. Morales, supra, 48 Cal.3d at p. 557; People v. Harris, supra, 47 Cal.3d at p. 1100.) Moreover, the *420 lying-in-wait and rape-murder special circumstances were not all that made defendant death eligible. The jury also found true the special circumstance of multiple murder, which dramatically distinguishes this case from other murder cases. Defendant challenges our holding in People v. Anderson (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] that intent to kill is not an element of a felony-based special circumstance. The argument not only lacks merit for the reasons stated in Anderson; it is irrelevant to this case. As the trial was held before Anderson but after our decision in Carlos v. Superior Court (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], the court instructed the jury that intent to kill was an element of the rape-murder special circumstance.
Defendant complains the court said the jury “may consider any of the factors that have been presented to you to be mitigating or aggravating, as you find them to be . . . .” As he requested the instruction, the doctrine of invited error bars the contention. (People v. McPeters, supra, 2 Cal.4th at p. 1191, fn. 2.) It also lacks merit. Although some of the statutory factors are inherently only aggravating or mitigating (People v. Hamilton (1989) 48 Cal.3d 1142, 1183-1184 [259 Cal.Rptr. 701, 774 P.2d 730]), because this is self-evident, the court need not identify which is which. (People v. Fudge, supra, 7 Cal.4th at pp. 1126-1127; People v. Zapien, supra, 4 Cal.4th at p. 990; see also Tuilaepa v. California (1994) 512 U.S. 967, 979 [114 S.Ct. 2630, 2638, 129 L.Ed.2d 750] [“A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision.”].) Contrary to defendant’s argument, we see no reasonable likelihood the jury may have considered evidence of mental illness as aggravating. Neither the arguments nor instructions contained such a suggestion. (People v. McPeters, supra, 2 Cal.4th at p. 1191.) Defendant argues the court’s use of the statutory language “[w]hether or not” “compounded” the alleged error. It did not. (People v. Cooper, supra, 53 Cal.3d at p. 843.)
Defendant complains the death penalty law does not “guarantee that squarely contrary facts will not be given aggravating weight in different cases” because, he argues, different prosecutors may make contradictory arguments as to what is an aggravating circumstance. However, what might be aggravating (or mitigating) depends on the overall facts of any given case. We see nothing improper in allowing the jury to consider the facts of the case at hand without regard to what might be argued or considered in some other case. Defendant also argues the jury would interpret the instruction in the language of Penal Code section 190.3, factor (d) (“Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.”), as meaning it could not consider any mental or emotional disturbance “if it did not influence the actual *421 commission of the crime.” However, the court also gave the “catch-all” instruction of Penal Code section 190.3, factor (k), recommended in People v. Easley, supra, 34 Cal.3d at page 878, footnote 10. That instruction informed the jury of the full range of mitigating evidence. (People v. Edwards, supra, 54 Cal.3d at pp. 841-842; People v. Ghent (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250].)
Defendant complains that the pretrial notice of aggravating evidence did not specify evidence related to the circumstances of the crime. It did not need to. (People v. Champion, supra, 9 Cal.4th at p. 942; People v. Clark, supra, 5 Cal.4th at p. 1033.) Defendant also may not now complain of lack of notice because he did not object at trial. (People v. Cooper, supra, 53 Cal.3d at p. 842.) Defendant argues the court improperly required the jury to return a separate penalty verdict for each murder. It did not err. (People v. Sandoval (1992) 4 Cal.4th 155, 197 [14 Cal.Rptr.2d 342, 841 P.2d 862].) Moreover, the jury returned a verdict of death as to both murders.
Defendant complains there is no proportionality review of his penalty. It is not required. (People v. Turner (1994) 8 Cal.4th 137, 209 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Moreover, “even were such a procedure mandated in this state, it is inconceivable that this defendant would benefit from it.” (People v. Hovey, supra, 44 Cal.3d at p. 586.) The death sentence is also not so disproportionate that it shocks the conscience or offends fundamental notions of human dignity. (People v. Davenport, supra, 11 Cal.4th at p. 1235.)
Contrary to defendant’s arguments: the court need not delete inapplicable statutory factors (People v. Malone (1988) 47 Cal.3d 1, 47 [252 Cal.Rptr. 525, 762 P.2d 1249]); the jury need not make written findings (People v. Medina, supra, 51 Cal.3d at pp. 909-910); the jury need not agree unanimously as to aggravating circumstances, find them proven beyond a reasonable doubt, or find beyond a reasonable doubt that aggravating factors outweigh mitigating factors and that death is the appropriate penalty (People v. Bacigalupo, supra, 1 Cal.4th at p. 147; People v. Marshall (1990) 50 Cal.3d 907, 935-936 [269 Cal.Rptr. 269, 790 P.2d 676]); prosecutorial discretion in deciding whether to seek the death penalty is constitutional (People v. Crittenden, supra, 9 Cal.4th at p. 152); and the recent “Three Strikes” legislation did not preclude imposition of death in this case (People v. Alvarez, supra, 14 Cal.4th at pp. 246-247).
14. Cumulative Prejudice
Defendant contends the cumulative effect of the guilt and penalty errors was prejudicial. There was, however, little error to accumulate. Considering the massive amount of evidence presented, the number of crimes *422 proven at both phases, and the vigor with which defense counsel represented defendant, the trial was remarkably error free. The defense was allowed to present all relevant mitigating evidence, the evidence and arguments of counsel were properly focused on defendant and his crimes as well as possible mitigating factors, and the jury engaged in the necessary weighing process. We are satisfied there is no reasonable possibility any error, even in cumulation, affected the verdict. (People v. Kelly, supra, 1 Cal.4th at p. 551; People v. Morris (1991) 53 Cal.3d 152, 232-233 [279 Cal.Rptr. 720, 807 P.2d 949].)
We disagree with defendant’s assessment that this was a “close case.” His crimes, including the recidivism they reveal, the length of time over which they were spread, their callousness, and the number of victims, both those who survived (generally in his early years) and those who did not (in his later years), are appalling even by the standards of capital cases. Defendant’s criminal career was long and violent before he began the reign of terror that took seven innocent lives in five separate assaults. Defense counsel presented evidence in mitigation that was impressive in quantity, ranging through defendant’s entire life experience and including several kinds of expert testimony, but was ultimately unconvincing. The mitigating evidence, even in sum, paled before the crimes.
Defendant claims the length of the deliberations shows the decision was close. The record is somewhat unclear, but the penalty jury deliberated less than 24 hours over 7 days. In light of the amount of evidence, the other crimes proven at the penalty phase—which the jury could consider only if it first found defendant committed them beyond a reasonable doubt—and the enormity of the decision, it is not surprising the deliberations were protracted. The penalty jury heard the guilt evidence, but did not deliberate during that phase. Rather than proving the case was close, the length of the deliberations suggests the jury conscientiously performed its duty. (People v. Cooper, supra, 53 Cal.3d at p. 837.)
We agree with the final assessment of the trial court: “[W]hatever are the factors that have molded [defendant’s] character and his personality, whether they are of genetic origin or the product of an abused childhood and a failed institutional system, there is no doubt but that at the age of 50, David Carpenter decided to embark upon a series of rapes and murders. There is nothing to indicate that this decision was participated in by any person other than himself. There is nothing to indicate that there was any defect in his thought processes or that he lacked control of his own actions or that he lacked the ability to appreciate the criminality of his conduct. For reasons that are known only to him, and based only on whatever kind of justification *423 a person could create for such conduct, he went out and killed these two young women. He intentionally and deliberately took their lives. [H In looking at the background of his life and the five other murders committed during the same period of time, under the same circumstances, with the same method of operation, and with the same gun, and against the tapestry of his life of violence, I must conclude with the prosecution that if ever there was a case in which the death penalty was appropriate, this is that case.”
E. Automatic Motion to Modify Death Verdict
Defendant contends the court committed several errors in denying the automatic motion to modify the judgment. (Pen. Code, § 190.4, subd. (e).) Before ruling, the court read the probation report, which attached letters containing information about the victims and urging the death penalty, and heard from Heather Scaggs’s mother, who also urged the death penalty. Defendant is correct that in ruling on the motion to modify, the court reviews only the evidence presented to the jury, which included neither the probation report, nor the letters, nor the mother’s statement. (People v. Cummings, supra, 4 Cal.4th at pp. 1330-1331; People v. Williams (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221].) After the ruling of this case, we stated that “the preferable procedure is to defer reading the probation report until after ruling on the automatic application for modification of verdict.” (People v. Lewis (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].) “However, absent a contrary indication in the record, we assume that the court was not influenced by the report in ruling on the motion.” (People v. Livaditis, supra, 2 Cal.4th at p. 787.) The record here shows the court was not influenced by anything other than the evidence presented to the jury.
The court expressly recognized its duty to “review the evidence” and stated its ruling was based on “the evidence.” Its discussion of the crimes and factors in aggravation mentioned only matters presented to the jury. (By contrast, the court did consider—and rejected as “incredible”—a letter from Dr. Haney trying to bolster his testimony in mitigation.) The court gave exhaustive reasons for denying the motion, “all of which were based on, and amply supported by, the evidence presented at trial.” (People v. Livaditis, supra, 2 Cal.4th at p. 787.)
Defendant argues the court found as aggravating two factors that can only be mitigating. The court stated that Penal Code section 190.3, factor (d) (“Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.”), “supports aggravation” because the “evidence shows that the defendant carefully *424 planned each of these homicides” and “was not under the influence of any extreme mental or emotional disturbance.” Defendant is correct that the mere absence of a mitigating factor is not itself aggravating (People v. Davenport (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861]), but “the court may properly consider in aggravation the ‘objective circumstances of the killing.’ ” (People v. Cooper, supra, 53 Cal.3d at p. 848.) Any error in considering these circumstances under the wrong statutory factor did not affect the court’s decision. (Ibid.) The court also found aggravating some of the circumstances of defendant’s life and relationship with his parents. The statement, while also technically error, came in the context of considering as mitigating other aspects of that same relationship and was not prejudicial.
Defendant argues the court misunderstood the concept of mitigation. The record does not support the claim. The court discussed the mitigating evidence in meticulous detail. Defendant pulls from context isolated statements and argues the court assumed “that mitigation meant little, if anything, more than insanity or diminished capacity.” For example, defendant quotes the court as saying, “There is, however, no evidence the defendant lacks the capacity to conform his conduct to the norms of society.” The court went on to observe, “There is no evidence the defendant ever suffered from any kind of insane delusion, paranoia, schizophrenia, or any mental disease or defect. He is described as well above average in intelligence and capable of learning. He has held good, responsible jobs during his life. He is easily trainable in various occupations.” (Italics added.) These comments were unobjectionable. Although evidence of the defendant’s mental state does not have to rise to the level of insanity or diminished capacity to be offered or considered in mitigation, the fact that it is not of that caliber is certainly relevant to its weight. The court did consider the evidence in mitigation; it merely found the aggravating circumstances “far" outweighed the mitigating. (People v. Edwards, supra, 54 Cal.3d at p. 847.) Defendant also argues without merit the court improperly considered his age in aggravation. (People v. Douglas (1990) 50 Cal.3d 468, 539 [268 Cal.Rptr. 126, 788 P.2d 640].)
In addition to the mitigating and aggravating factors, the court discussed the strength of the evidence that defendant committed these crimes. In part, the court cited the fact the killings were “done with remarkable similarity.” Among the similarities the court cited was that each of the victims was “a young Caucasian,” and each of the women was “slender and extremely attractive." Defendant seeks to transform this description of the similarity of the crimes into an implication “that the moral worth of the victims is, and the outcome of the sentencing should be, related to the victims’ race and other immutable personal characteristics.” He suggests the court viewed the victims’ race as a reason for imposing the death penalty, and goes so far as to *425 argue the judge must be disqualified so he can have a hearing before a court “uninfluenced by . . . consideration of the victims’ race.”
Defendant’s accusation that the court viewed race as a reason to impose the death penalty is as serious as it is baseless. The similarity of the crimes supports the inference that one person, defendant, committed each, and the court legitimately commented on that similarity in ruling on the modification motion. Nowhere in discussing the aggravating or mitigating factors did the court remotely suggest it considered the “moral worth” or race of the victims. We cannot condemn too strongly defendant’s distortion of the court’s comments in his attempt to inject a racial issue into this case where none exists.
Any error in the court’s lengthy statement of reasons for denying the modification motion was harmless. The court did not consider the question close, which is most reasonable considering the evidence. We find no reasonable possibility any error affected the ruling. (People v. Benson, supra, 52 Cal.3d at p. 813; People v. Rodrigues, supra, 8 Cal.4th at p. 1197.)
III. Conclusion
The judgment is affirmed.
George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

 Defendant was later tried, convicted, and sentenced to death for the Marin County crimes, including five more murders. (See In re Carpenter (1995) 9 Cal.4th 634, 640-642 [38 Cal.Rptr.2d 665, 889 P.2d 985].)

 In argument to the jury, defense counsel stated, “[T]he credible and the convincing evidence that you have heard . . . clearly shows that David Carpenter killed Ellen Hansen and Heather Scaggs. That will not be an issue in your deliberations.”

 We do not suggest two juries are preferable to one. As we have noted, use of a single jury has its advantages and is the legislative preference. (Pen. Code, § 190.4, subd. (c); People v. Beardslee, supra, 53 Cal.3d at p. 102; People v. Fields (1983) 35 Cal.3d 329, 351-352 [197 Cal.Rptr. 803, 673 P.2d 680].) We hold only that once the court granted defendant’s motion for separate juries, at a time when it was not as settled as now that a single jury is permissible *372 (see, e.g., Lockhart v. McCree, supra, 476 U.S. 162, decided after this trial), the procedure actually followed was not error.

 Defendant also appears to contend the prosecutor committed misconduct by arguing the evidence to the jury. That contention is not cognizable on appeal because he did not object at trial. (People v. Cain (1995) 10 Cal.4th 1, 48 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) Moreover, because the court properly admitted the evidence, there was no misconduct. Defendant also incorrectly claims the court ruled that two of the Marin County murders were not probative on premeditation and deliberation. The court did express initial skepticism, but ultimately it admitted the evidence on those questions.

 Defendant cites People v. Zapien, supra, 4 Cal.4th at pages 985-986, where, he asserts, “the defendant allegedly asked the victim for money.” He misreads the facts of that case. The defendant in Zapien “request[ed] money from his sister . . . .” (Id. at p. 985; see id. at p. 947.) The sister was not the murder victim, and the request occurred more than two hours before the crime. (Id. at pp. 946-947.)

 Effective January 1, 1982, the Legislature abolished the defense of diminished capacity, but the abolition does not apply retroactively to this case. (People v. Pensinger (1991) 52 Cal.3d 1210, 1241 & fn. 5 [278 Cal.Rptr. 640, 805 P.2d 899].)

 Shortly before oral argument, defendant moved to augment or settle the record to try to establish whether the jury examined the exhibits. As the question is not pertinent to our resolution of the issue, we denied the motion.